65 A.3d 318

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Lewis M. JORDAN, a/k/a John Lewis, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 14, 2011.

Decided April 24, 2013.

514

518

Michael Coard, Esq., for Appellant.

Amy Zapp, Esq., PA Office of the Attorney General, Hugh J. Burns, Esq., for Appellee.

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

Lewis M. Jordan, a/k/a John Lewis ("Appellant"), pled guilty to murder generally in the shooting death of Philadelphia Police Officer Charles Cassidy. Following a trial by jury to determine degree of guilt, Appellant was convicted of first-degree murder and sentenced to death. In this direct appeal, Appellant raises four issues. Concluding that Appellant is entitled to no relief on any of these issues and that the evidence was sufficient to sustain Appellant's conviction, we affirm the judgment of sentence.

The relevant facts of this case are as follows. During a period of approximately six weeks in the fall of 2007, Appellant committed six armed robberies of retail food shops in North Philadelphia. Specifically, on September 18, 2007; September 21, 2007; and October 13, 2007, respectively, Appellant robbed three different Dunkin' Donuts shops at gunpoint. On October 20, 2007, and October 25, 2007, respectively, he robbed two pizza shops at gunpoint. Finally, at approximately 10:30 a.m. on October 31, 2007, Appellant returned to the Dunkin' Donuts shop that was the site of his first robbery, and again demanded money from the employees at gunpoint. While this final robbery was in progress, Officer Charles Cassidy, who was dressed in his police uniform, parked his car in front of the shop and opened its front door. As the officer was about to enter the shop, Appellant turned toward the officer, took two steps in his direction, pointed a gun at him, and shot him in

the forehead at close range. Appellant immediately fled from the scene, stopping to bend over to take the fallen officer's service revolver. On November 3, 2007, Appellant traveled by bus to Miami, where he was arrested a few days later and then brought back to Philadelphia.

Appellant's trial began on November 9, 2009. After *voir dire* but before any testimony had been presented, Appellant pled guilty to the murder of Officer Cassidy, as well as to all six armed robberies. As the court explained to the jury, the trial's scope had thus been narrowed, such that the only issue left to be determined was whether Appellant had committed first-degree or second-degree murder. *See* Notes of Testimony ("N.T.") Trial, 11/12/09, at 12. At trial, the Commonwealth presented several eyewitnesses to each of the robberies, as well as a surveillance videotape of the robbery and murder. The final prosecution witness was Officer Cassidy's widow. Trial counsel's defense strategy was to argue that Appellant had fired his gun in a "panicky reaction" when Officer Cassidy interrupted the robbery in progress. *See id.* at 48, 53 (defense opening statement); *id.*, 11/19/07, at 36 (defense closing argument). After the Commonwealth rested on November 18, 2009, the defense proffered no evidence and immediately also rested. The next day, following closing arguments and instructions from the court, the jury began its deliberations and within hours found Appellant guilty of first-degree murder.

A two-day penalty phase hearing began on November 20, 2009. Officer Cassidy's adult children and his widow expressed, via letters written to the court, the effects of Officer Cassidy's death on the family. Appellant presented the testimony of his mother, grandmother, and sister. The jury found three aggravating circumstances, to wit, killing of a peace officer in the performance of his duties, 42 Pa.C.S. § 9711(d)(1); killing committed during the perpetration of a felony, § 9711(d)(6); and significant history of violent felony convictions, § 9711(d)(9), and one mitigating circumstance, to wit, any other evidence of mitigation, the "catch-all" mitigator, § 9711(e)(8). The jury also found that the aggravating circumstances outweighed the mitigating circumstances, and ac-

cordingly determined that Appellant should be sentenced to death.

On direct appeal before this Court, Appellant raises four issues, three alleging trial court error and one alleging prosecutorial misconduct.[1]

## Sufficiency of the Evidence

■ Before addressing the four issues raised by Appellant, we must review the legal sufficiency of the evidence to support his first-degree murder conviction, as we do in all cases in which a sentence of death has been imposed. *See, e.g., Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 306 (2011). In this sufficiency review, we determine whether the evidence presented at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of first-degree murder beyond a reasonable doubt. *Id.*

1. Appellant's issues are the following, which we have set forth verbatim.

 1. Did the trial court commit reversible error by denying appellant's Pre–Trial Motion To Sever and by subsequently allowing the Commonwealth, during the capital murder trial, to present irrelevant, inflammatory, and otherwise unduly prejudicial evidence regarding the specific details of each of the other five separate armed robbery incidents despite the fact that appellant, during his arraignment in the jury's presence, had already pled guilty to those robberies, thereby rendering trial evidence thereof wholly impertinent?

 2. Did the trial court commit reversible error by allowing the Commonwealth to display a slowed down version of the videotaped shooting death, with such version therefore presenting an artificial and exaggerated perception to the lay jury of the "willfulness, premeditation, and deliberation" required for first degree murder?

 3. Did the trial court commit reversible error by allowing the Commonwealth to repeatedly inflame the passions of the capital jury with improper victim impact testimony at trial (as opposed to the penalty phase) in a case that was already quite emotional in that it involved the videotaped shooting death of a police officer?

 4. Did the Commonwealth engage in prosecutorial misconduct during the capital trial and especially during the penalty phase by disingenuously stating that appellant had never shown remorse and that appellant had never said he was sorry when he was captured by police despite the Commonwealth knowing as an unarguable matter of fact that such statements were patently false?

 Appellant's Brief at 5–6.

■ There are three elements of first-degree murder: (i) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011). As set forth in the third element, first-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d). "Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." *Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 910 (2002). The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. *Commonwealth v. Rivera*, 603 Pa. 340, 983 A.2d 1211, 1220 (2009); *Drumheller, supra; Commonwealth v. Earnest*, 342 Pa. 544, 21 A.2d 38, 40 (1941) ("Whether the intention to kill and the killing, that is, the premeditation and the fatal act, were within a brief space of time or a long space of time is immaterial if the killing was in fact intentional, willful, deliberate and premeditated."). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Houser, supra* at 1133–34; *Briggs, supra* at 306–07; *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 130–31 (2008). Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury. *Commonwealth v. Carroll*, 412 Pa. 525, 194 A.2d 911, 916 (1963).

■ Based on our review of the certified record in the case before us, we conclude that the evidence was sufficient to support Appellant's first-degree murder conviction. One of the medical examiners who participated in the autopsy of Officer Cassidy's body testified that the officer had sustained a single gunshot wound to the head, with the bullet entering above his right eyebrow and lodging in the back of his brain. N.T. Trial, 11/18/09, at 130–31. The medical examiner concluded that a deadly weapon had been used on a vital part of Officer Cassidy's body, resulting in his death. *Id.* at 134–35.

The evidence that Appellant was responsible for the killing was overwhelming. Three eyewitnesses (two employees and one customer) identified Appellant as the assailant. *Id.*, 11/16/09, at 66–67, 76–79, 121–23; *Id.*, 11/17/09, at 4–5. The two employees recognized Appellant when he entered the Dunkin' Donuts on October 31, 2007, as the man who had robbed them approximately six weeks before. *Id.*, 11/16/09, at 77–78, 123–24, 129–30. One of Appellant's cousins and a family friend each testified that Appellant had admitted to them that he had killed the officer. *Id.*, 11/17/09, at 32, 68–69. The murder weapon and Officer Cassidy's service revolver were found in a trash bag in the drop ceiling of the home of one of Appellant's relatives, and Appellant's DNA was detected on both firearms. *Id.*, 11/17/09, at 131–35, 143; *Id.*, 11/18/09, at 102–04, 118–19.

A surveillance camera captured the robbery and murder on videotape. The videotape was played at trial, accompanied by the explanatory testimony from one of the Dunkin' Donuts employees who had been working at the time of the robbery and murder. The videotape showed Appellant entering the front door of the Dunkin' Donuts, pushing a customer to the side while holding a gun, glancing over his shoulder when Officer Cassidy came to the front door, and turning around to face the front door and the officer. Then, as revealed by the video, Appellant took two steps in Officer Cassidy's direction, raised his gun, and aimed it toward Officer Cassidy, who remained near the front door. The officer immediately fell, and Appellant fled through the front door, past the fallen officer; as Appellant was fleeing, he bent over and picked up the officer's service revolver from the ground. N.T. Trial, 11/16/09, at 94–108. The crime scene investigator who had studied the scene of the murder and viewed the surveillance videotape, testified that Appellant had been approximately three feet from Officer Cassidy at the time of the shooting. *Id.* at 144–45.

The above-summarized evidence is sufficient to establish all three elements of first-degree murder, *i.e.*, that Appellant had formulated the specific intent to kill Officer Cassidy and had

fatally acted on that intent. We turn now to the issues raised by Appellant.

### Evidence of prior robberies

In his first issue, Appellant asserts that the trial court erred by admitting evidence of the five previous robberies to which Appellant had pled guilty in front of the jury at the beginning of his trial. Appellant argues that the evidence was not merely irrelevant, but also "inflammatory and otherwise unduly prejudicial." Appellant's Brief at 13. In response, the Commonwealth argues that evidence of Appellant's prior robberies was relevant to show Appellant's intent, to disprove mistake or accident, to demonstrate common scheme, plan or design, and to show the history and factual development of the case. Commonwealth's Brief at 14–15 (citing Pa.R.E. 404(b)(2)). The Commonwealth emphasizes that the evidence concerning Appellant's prior robberies established that, over the course of Appellant's crime spree, he became increasingly angry, more threatening, more violent, and more inclined to use force. *Id.* at 14–15.

The trial court held that the evidence of Appellant's prior robberies was properly admitted to prove Appellant's intent and absence of mistake or accident. Trial Court Opinion, dated 4/28/10, at 5–7 (citing Pa.R.E. 404(b)). In agreement with the Commonwealth, the trial court found that the evidence of Appellant's five prior robberies established his increasingly violent and aggressive conduct. *Id.* at 7. The trial court also found that the probative value of the evidence outweighed its potential for prejudice, particularly since the evidence "was not sensational or inflammatory and was introduced without theatrics." *Id.* at 8. Finally, the trial court determined that, even if it had been error to admit evidence of the prior robberies, the error was harmless because the Commonwealth's other evidence overwhelmingly supported Appellant's conviction of first-degree murder. *Id.*

In general, relevant evidence, *i.e.,* evidence that "logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable[,] or supports a

reasonable inference or presumption regarding a material fact," is admissible. *Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523, 539 (2006). However, relevant evidence may be excluded if its probative value is outweighed by the likelihood of unfair prejudice. *Id.* at 539 & n. 6 (citing Pa.R.E. 403). Admission of evidence rests within the sound discretion of the trial court, which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury. *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 623 (2010). We will reverse a trial court's decision as to admissibility of evidence only if we conclude that the trial court has abused its discretion. *Id.*

Under our rules of evidence, evidence of an accused's other crimes is not admissible to show an accused's bad character or criminal propensity, but it may be admissible for some other legitimate purpose, as set forth in Pennsylvania Rule of Evidence 404(b).

**(b) Other crimes, wrongs, or acts.**

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404(b); *see also Flor, supra; Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002).

In *Commonwealth v. Bracey*, 541 Pa. 322, 662 A.2d 1062, 1069–70 (1995), a capital murder case, we upheld the trial court's admission into evidence of the appellant's statement that, prior to shooting and killing a police officer, he had armed himself in order to rob drug dealers. The appellant

had confessed to killing the officer, and thus the only issue at trial was degree of guilt. *Id.* at 1070. In arguing against a first-degree murder verdict, defense counsel asserted that the appellant had not had the requisite specific intent to kill the officer, but rather had acted out of fear after the officer had chased the appellant and had drawn his firearm. *Id.* at 1066, 1070. This Court held that the trial court did not abuse its discretion in admitting the appellant's statement about arming himself, reasoning as follows: "where [the appellant] aggressively advanced a claim of reduced intent, evidence that he armed himself in order to rob drug dealers was sufficiently intertwined with the contention of fear underlying the claim of reduced intent so as to render it relevant to the ultimate question before the jury"—to wit, whether the appellant intended to kill the officer and thus was guilty of first-degree murder. *Id.* at 1070.

Likewise, in the case before us, where Appellant admitted the murder and his defense was lack of specific intent to kill, the evidence regarding the five prior robberies was sufficiently intertwined with Appellant's claim that he had experienced a "panicky reaction" so as to render it relevant to the ultimate question of whether Appellant had possessed the specific intent to kill when he shot Officer Cassidy. The evidence established that Appellant had committed all of his robberies over a relatively short time period, approximately six weeks, within a fairly small area of Philadelphia. N.T. Trial, 11/12/07, at 69–71; *Id.*, 11/13/07, at 3–6. In addition, the evidence established that, as Appellant's robbery spree progressed, his demeanor became increasingly belligerent and aggressive and he employed greater violence.

This evolution of Appellant's conduct was an important aspect of the testimony of two Dunkin' Donuts employees who had witnessed both the first robbery and the final robbery/murder. At the first robbery, Appellant walked into the shop; argued about the price of an item; pulled out a gun and waved it; demanded money; took the money, food, and coffee; and then walked away without swearing or verbal threat. *Id.*, 11/16/07, at 68–72, 118–20. At the last robbery, during which

Officer Cassidy was murdered, Appellant entered the same shop and, with gun in hand, pushed a female customer aside and yelled at the employees not to move. One of the employees testified that she was frightened that Appellant would kill her. The employee testified that Appellant was very angry and was "different" from the first robbery, in that during the first robbery, "he really just want[ed] the money," but during the second robbery, he "did not look like he was trying to get the money only." *Id.* at 98, 123–24, 128–30.

Testimony of eyewitnesses to the four middle robberies also referenced Appellant's increasingly violent conduct. An employee eyewitness to the second robbery testified that, after Appellant had entered the Dunkin' Donuts shop, he had waved his gun, jumped over the counter, demanded money, took the money, put it in his pockets, and walked away. *Id.*, 11/12/ 07, at 90–94. This eyewitness also testified that Appellant had pointed the gun at him but had not verbally threatened him. *Id.* at 97. Two employee eyewitnesses to the third robbery, of yet another Dunkin' Donuts shop, on October 13, 2007, testified that Appellant had walked to the cash register, pulled out and started waving a gun, and repeated "give me the fuckin' money" in a loud and aggressive voice and with an angry manner. *Id.* at 119–20, 140–42. When the shop supervisor had run toward the bathroom, Appellant had run after her and pushed her toward another employee. *Id.* at 121, 133–34, 143. Appellant had pointed his gun at the employees, although he had not threatened to shoot them. *Id.* at 137–38.

Two eyewitnesses, an employee and a regular customer, testified with regard to the fourth robbery, this time of a pizza shop, on October 20, 2007. Both eyewitnesses testified that Appellant had walked to the counter of the pizza shop and told the employees to "give me the fuckin' money." N.T. Trial, 11/13/07, at 11, 29. The employee testified that when Appellant had first asked for the money, she thought he was joking because she recognized him as a regular customer, in fact, one to whom she had previously spoken regarding his new tattoo. *Id.* at 25–27, 29. The customer testified that Appellant had pointed the gun at him twice and told him to hang up his cell

phone, and also that he saw Appellant put his gun in the cook's face. *Id.* at 11–13. The customer also testified that he was fearful, especially for the safety of his nine-year-old son who was with him. *Id.* at 12–13. The customer described Appellant's demeanor as "calm" at first, but then "irritated" when he thought the employee was taking too long to get the money. *Id.* at 15. The employee testified that Appellant had appeared "angry, maybe frustrated." *Id.* at 30.

Several employees testified with regard to the penultimate robbery on October 25, 2007, six days before the murder of Officer Cassidy. The pizza shop cashier testified that Appellant purchased some small items, then took his gun out and, while moving it and pointing it at her, said "forget this shit, give me all the money you have." *Id.* at 41–43. As related by the cashier, Appellant "was angry. You could tell by his face, he was angry." *Id.* at 46. While the cashier was giving him the money from the cash register and her pocket, she asked him not to hurt her children, who were in the office. Appellant then walked straight to the office, pointed his gun at the children, and screamed at them to "get the fuck out." *Id.* at 43–44, 46–48. At this point, Appellant noticed another employee attempting to hide, said to him "where do you think you are going, mother fucker," grabbed him, hit him in the head with the gun, and pushed him out of the way. *Id.* at 44–45, 49. Appellant herded all of the employees into a corner and yelled "somebody give me more fuckin' money." *Id.* at 45, 49–50. Then, Appellant grabbed the cashier by the hair, pushed her into the office, and told her to open the safe. When the cashier told him that only her boss knew how to open the safe, Appellant pushed her into the corner with the other employees and demanded more money from them. *Id.* at 45, 51. With regard to what happened next, the cashier then testified as follows: "I was like please don't shoot and he was like nobody's going to die, mother fucker. Just do what I am saying. So Marina, one of the driver's wife [sic], she had some money and she took it out and gave it to [Appellant]. At the same time, I am walking to the register to show [Appellant] we have no more [bills] but [only] change. He got upset

and he shot the floor." *Id.* at 45. The employees were about four to five feet from Appellant when he fired a bullet from his gun into the floor. *Id.* at 52.

The cashier's teenage son, whom Appellant had forced from the pizza shop's office at gunpoint, was also a witness. He testified that Appellant pulled his mother by the hair into the office and then back out of the office, causing her to be "crying and scared." *Id.* at 53. He further testified that, during the encounter, Appellant was "mad" and acted as follows: "[Appellant] said you better give me something or something is going to go on and that is when he looked at the door in the front and he just said ["]don't anybody try to do nothing or I will kill you["] and he shot [a bullet] to the ground toward like the bathroom area. It bounced off the ground toward the wall and he walked out, that's it." *Id.* at 64; *see id.* at 59.

The third witness to this robbery, a cook employed by the shop, testified that Appellant grabbed him by his back, held a gun against the center of his forehead, and told him not to look at Appellant's face. *Id.* at 75–77. This witness further testified that Appellant's tone of voice was "aggressive" and that he and Appellant were two feet apart when Appellant fired a bullet into the floor. *Id.* at 80–81.

Thus, the Commonwealth presented evidence, as summarized above, of Appellant's actions, his statements, and his demeanor during the commission of each of the six robberies. It is inarguable that evidence of Appellant's actions, statements, and demeanor during the last robbery was relevant to his state of mind when he shot Officer Cassidy, only seconds after the officer interrupted that robbery in progress. Likewise, evidence of Appellant's actions, statements, and demeanor during the five similar robberies that preceded the robbery/murder was relevant to show the increasing extent to which Appellant intentionally employed violence against those individuals who happened to stand between him and his felonious ends. The evidence was not proffered to show Appellant's bad character or criminal propensity. It was proffered to show that Appellant had threatened, verbally and

with a firearm, the employees of the shops that he had targeted during his crime spree, expressly threatening to kill them if they did not follow his instructions. It was proffered to show that Appellant had deliberately discharged his firearm within a few feet of the frightened employees during his penultimate robbery. It was proffered to show that Appellant's demeanor was angry, impatient, verbally abusive, threatening, and physically violent. That violence culminated in the murder of Officer Cassidy. The evidence of Appellant's increasingly threatening and violent conduct was unquestionably relevant to establish Appellant's intent and to show that the shooting was not some accidental, reflexive reaction to the officer's appearance on the scene. The trial court did not abuse its discretion in admitting evidence of Appellant's five prior robberies, and Appellant is entitled to no relief on his first issue.[2]

## Surveillance Videotape

In Appellant's second issue, he claims that the trial court should not have permitted the Commonwealth to show the Dunkin' Donuts surveillance videotape, which captured the robbery and murder, in slow motion because it created a false

**2.** Appellant also asserts that the trial court erred in denying his motion to sever the charges relating to the murder of Officer Cassidy from the charges relating to the preceding five robberies. *See* Appellant's Brief at 17–20. This claim is waived because Appellant did not raise it in his Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b). *See Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 458 (2006).

The claim is also meritless. The decision to sever is within the discretion of the trial court, and we will reverse only if the trial court has abused that discretion. *Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418 (1997). This Court has set forth a three-part test to guide the trial court in deciding a motion to sever:

(1) whether the evidence of each of the offenses would be admissible in a separate trial for the other; (2) whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, (3) whether the defendant will be unduly prejudiced by the consolidation of offenses. *Id.*

Our review of the evidence relevant to Appellant's multiple robberies, *see* text *supra*, provides no support for his claim that the trial court abused its discretion in denying severance.

impression of how much time elapsed between Officer Cassidy's appearance at the door and his murder. In Appellant's view, the slow-motion videotape made the relevant time period appear longer than it actually was, and thereby "create[d] a false impression of premeditation," improperly enhancing the likelihood that the jury would conclude that Appellant had acted with deliberation, premeditation, and specific intent. Appellant's Brief at 22. In response, the Commonwealth maintains that it showed the videotape in slow motion so that the jury could observe Appellant's precise actions just prior to and after the murder, particularly because Appellant disputes the Commonwealth's interpretation of those actions. Commonwealth's Brief at 21. More specifically, in the Commonwealth's view, the slow-motion videotape refuted defense counsel's argument that Appellant killed Officer Cassidy in a spontaneous, essentially reflexive "panicky reaction." *Id.* at 22. The Commonwealth also notes that the jury viewed the videotape both in real time and in slow motion, and asserts that the jury was well aware that the murder took place within approximately two seconds after Appellant saw Officer Cassidy at the door of the Dunkin' Donuts shop. *Id.* at 22–23, 26.

The trial court explained its decision to allow the jury to view the slowed-down videotape as follows.

By playing the tape in slow motion, the jury was able to better discern the series of events that culminated in the shooting of Officer Cassidy. Moreover, the playing of the tape in slow motion disproved [Appellant's] assertion that the shooting occurred because he panicked, as it demonstrated that [Appellant] took two steps toward Officer Cassidy, aimed his weapon at [Officer Cassidy's] forehead, and fired it.

Trial Court Opinion at 13.

■ We adopt the following standard set forth by the Superior Court.

In determining whether to admit into evidence slow motion or freeze frame video, the standard to be applied by the trial court is the same as it is for the admission of other

evidence. It must be relevant and material and its probative value must outweigh its prejudicial impact.

In a sense, all slow motion and freeze frame video distorts reality.... Such distortion may enhance the jury's understanding or it may do the opposite.... If the judge concludes that the jury's understanding will be enhanced and that the slow motion or freeze frame is more probative than prejudicial, then the judge should admit the evidence. Of primary relevance is the purpose for which the party offers a slow motion or freeze frame version of a videotape.

*Commonwealth v. Hindi*, 429 Pa.Super. 169, 631 A.2d 1341, 1345 (1993).

■ Like other evidentiary rulings, the admissibility of a slow-motion videotape rests within the sound discretion of the trial court, and we will not reverse absent an abuse of discretion. *Id.* at 1344. In *Hindi, supra*, the Superior Court upheld the trial court's denial of the defendant/appellant's motion to show a slow-motion videotape of the confrontation that had led to his arrest. The defendant/appellant sought to prove, *inter alia*, that he had been hit by a car involved in the confrontation, a contention that the driver of the car disputed at trial. *Id.* at 1343–45. Although the trial court had not allowed the jury to view a slow-motion version of the videotape, the court had admitted the videotape in real time, as well as enlarged still photographs of the moment when the car contacted the defendant/appellant's body. *Id.* at 1343, 1346. The Superior Court held that the trial court had not abused its discretion with these rulings; however, the Superior Court was careful to note that the still photographs were taken from the same videotape frames as the defendant/appellant sought to show in slow motion. *Id.* at 1346. Had the trial court not allowed *any* evidence that the car had actually struck the defendant/appellant—no slow-motion videotape, no freeze-frame videotape, no still photographs taken from the videotape—then the Superior Court would have held that the trial court abused its discretion, resulting in reversible error. *Id.* at 1345–46. Finally, the Superior Court set forth several strategies to alleviate any concern as to confusion or prejudice

of the jury by the admission of a slow-motion videotape, including giving a cautionary instruction to explain the purpose(s) of the slow-motion videotape, showing the videotape at regular speed as well as in slow motion, and allowing the opposing party to comment freely on any possible distortion related to the slow-motion view. *Id.* at 1345.

The admissibility of slow-motion videotapes has also been addressed by appellate courts of other jurisdictions. For example, in *State v. Brewington,* 343 N.C. 448, 471 S.E.2d 398, 403 (1996), the issue was the admissibility, at the appellant's trial for robbery and first-degree murder, of a slow-motion version of a pawn shop surveillance videotape. The trial court had admitted the slow-motion videotape, determining that it was probative as to whether the appellant was guilty of premeditated murder, felony murder, or a lesser offense. The North Carolina Supreme Court upheld the trial court, concluding that the videotape was relevant to a critical issue in the case, to wit, the sequence of events at the time of the murder. *Id.* Courts in other states have ruled similarly. *See Burkhart v. Commonwealth,* 125 S.W.3d 848, 849–50 (Ky.2003) (holding that the trial court did not abuse its discretion in allowing the jury, during its deliberations, to view, in slow motion, a surveillance videotape that had been shown at regular speed during trial and that captured the appellant's motor vehicle offense at a convenience store); *Brown v. State,* 201 Ga.App. 510, 411 S.E.2d 366, 366–67 (1991) (holding that the trial court did not abuse its discretion in allowing the jury to review, during its deliberations, a surveillance videotape showing the convenience store robbery at issue in slow motion); *Scott v. State,* 390 N.W.2d 889, 892–93 (Minn.Ct.App.1986) (holding that the trial court did not abuse its discretion in allowing the jury to view, in slow motion and in real time, a videotape of an assault that occurred during a football game between inmate teams).

Here, we hold that the trial court did not abuse its discretion in admitting the slow-motion version of the surveillance videotape that captured Officer Cassidy's murder. At trial, the videotape was played for the jury several times, in

real time and in slow motion. The time, down to the second, at which the camera took the images, appeared as a digital display on the videotape, a fact that the Commonwealth pointed out several times to the jury. N.T. Trial, 11/16/09, at 100–03. The Commonwealth first played the videotape at regular speed, with frequent stops for an eyewitness to testify as to the images caught on the tape. *Id.* at 94–108. The Commonwealth's questioning of the witness in conjunction with the showing of the videotape established the following: at 10:30:29, Officer Cassidy was at the door of the shop and Appellant glanced over his shoulder in the officer's direction; at 10:30:31, Appellant pointed his gun at Officer Cassidy, after having taken a few steps in his direction; and the officer then fell to the ground. *Id.* at 100–01, 107. At this point in the questioning of the witness, the Commonwealth played the videotape in slow motion without interruption. *Id.* at 112–13. Later on the same day, the Commonwealth replayed the videotape in real time during the testimony of another eyewitness. *Id.* at 130–32. During closing argument, the Commonwealth again played the videotape in slow motion, but first emphasized that the crucial portion, *i.e.,* from the time that Appellant noticed Officer Cassidy at the Dunkin' Donuts door until the officer's murder, encompassed only two seconds. *Id.,* 11/19/09, at 88–89. The Commonwealth focused on Appellant's actions during those two seconds and then argued that his actions were incompatible with his claim of a spontaneous, reflexive "panicky reaction." *Id.* at 89–91. Specifically, the Commonwealth argued as follows: "As [defense counsel] said, it is two seconds but it was a sufficient time for [Appellant] to see, to react and that is not an involuntary reaction.... It is an intentional, purposeful act in his case.... It can be a fraction of a second. It was more than that in this case." *Id.* at 90–91. During jury deliberations, the court granted the jury's request to see the surveillance videotape again, both in real time and in slow motion. *Id.* at 163–67. .

The trial court did not abuse its discretion when it permitted the jury to view the slow-motion version of the surveillance videotape. The jury knew that there were two versions

of the videotape, one of which was in slow motion. The time that transpired was displayed on the tape and was repeatedly pointed out to the jury. Thus, the jury was well aware that Appellant shot Officer Cassidy within two seconds of the time that Appellant noticed the officer at the door. The sequence of Appellant's actions in that two seconds-first noticing the officer at the door, then taking two steps toward the officer, and then aiming a gun at the officer—were highly relevant to the issue of whether Appellant possessed the intent to kill. We can discern no abuse of discretion in the trial court's determination that the slow-motion videotape could and did aid the jury in observing and evaluating this sequence of events. Our case law makes abundantly clear that the specific intent to kill can be formulated in a fraction of a second; thus, the length of time that Appellant deliberated before raising his gun to fire a bullet into Officer Cassidy's head is not dispositive. Appellant is entitled to no relief on this issue.[3]

## Victim Impact Testimony

In his third issue, Appellant claims that the trial court erred by admitting the testimony of Officer Cassidy's widow into evidence during the guilt phase of trial because it was inadmissible victim impact evidence.[4] Appellant's Brief at 24. Mrs. Cassidy, the final Commonwealth witness, specifically testified as to the following: her 26–year marriage to and

3. We are unable to determine from the certified record the extent to which the slow-motion videotape was slowed, as compared to real time. However, at oral argument, defense counsel opined that the crucial two seconds of the tape, i.e., the time between Appellant's recognition that Officer Cassidy was at the door and the shooting of the officer, occupied four to six seconds in the slow-motion videotape. Thus, the slowing was not extreme, particularly in light of the fact that the length of time Appellant deliberated before killing Officer Cassidy is not dispositive under our decisional law.

4. In Appellant's statement of this issue, he asserts that the trial court allowed the Commonwealth "to *repeatedly* inflame the passions of the capital jury with improper victim impact testimony at [the guilt phase] of trial." Appellant's Brief at 5 (Statement of Questions Involved) (emphasis added). However, in the corresponding argument section of Appellant's brief, he discusses *only* the testimony of Mrs. Cassidy. *Id.* at 24–26 (Argument). Accordingly, we address only the testimony of Mrs. Cassidy.

three children with Officer Cassidy; the Sunday dinner that was the last time the whole family was together; the final dinner that she had with her husband; her husband's enjoyment of Halloween; a television show they watched together; her husband's morning routine, which he followed on the morning of his murder; and her last phone call with her husband, which took place shortly before his murder, and during which he teased her and was very happy and strong. N.T., 11/18/09, at 141–45. Mrs. Cassidy also testified in detail as to how she learned that her husband had been shot, relating that she learned from television news that an officer had been shot in the head and then heard a police officer knocking at her door, insisting that she come with him. *Id.* at 145–47.

Immediately after Mrs. Cassidy's testimony, defense counsel moved for a mistrial, arguing that her testimony "amounted to a rather detailed victim impact statement," which was irrelevant to whether Appellant had committed first-or second-degree murder, the only question before the jury. N.T. Trial, 11/18/09, at 148–49. The trial court rejected Appellant's argument, characterizing Mrs. Cassidy's testimony not as victim impact testimony, but rather as life-in-being testimony, albeit "a more extensive testimony concerning life and being." *Id.* at 150. Accordingly, the trial court denied Appellant's motion for a mistrial.[5] *Id.; see also* Trial Court Opinion at 11.

Before this Court, Appellant continues to argue that Mrs. Cassidy's testimony was a victim impact statement, which should not have been admitted at the guilt phase of trial, had

5. Defense counsel had sought a sidebar at the beginning of Mrs. Cassidy's testimony, a request that the trial court denied. N.T. Trial, 11/18/09, at 141 ("I will see you [defense counsel] later, not now."). At the close of Mrs. Cassidy's testimony, the court asked defense counsel if he wanted to put something on the record. It was at that point that defense counsel objected to the testimony as an irrelevant and improperly prejudicial victim-impact statement. *Id.* at 147–49. Defense counsel also told the trial court that he had sought a sidebar early in the testimony in order to make an appropriate objection, but given that the jury had heard the testimony, counsel moved for a mistrial. *Id.* at 149–50. On this record, we decline to accept the Commonwealth's assertion that Appellant failed to preserve an objection to Mrs. Cassidy's testimony. *See* Commonwealth's Brief at 27–28.

an improperly prejudicial and emotional effect, and inflamed the passions of the jury. Appellant's Brief at 24–26. Agreeing with the trial court's determination, the Commonwealth maintains that the testimony was not victim impact testimony at all, but rather was life-in-being testimony, proffered and properly admitted to establish that the victim was alive and well shortly before the murder. Commonwealth's Brief at 28; see N.T. Trial, 11/18/09, at 149–50. While the Commonwealth asserts that the testimony was not unfairly prejudicial, it also asserts that any possible concerns regarding how the jury may have used the testimony were "forestalled" by the trial court's instruction to the jury not to base its verdict on sympathy. Commonwealth's Brief at 30.

Prior to amendment of the Pennsylvania Sentencing Code in 1995, victim impact evidence was not admissible at any stage of a capital trial. *See Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 40 n. 28 (2008). On October 11, 1995, the General Assembly amended the Sentencing Code to permit the admission of victim impact evidence during the penalty phase of a capital trial. *See* 42 Pa.C.S. § 9711(a)(2) ("In the sentencing hearing, evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible."); [6] *Commonwealth v. Romero,* 595 Pa. 275, 938 A.2d 362, 379 n. 12 (2007). With regard to this provision, we have held as follows: "Testimony that is a personal account describing the devastating impact the murders had on the surviving families is wholly appropriate and admissible at the sentencing phase of a capital case." *Commonwealth v. Flor,* 606 Pa. 384, 998 A.2d 606, 634 (2010) (citation omitted).

For example, in *Commonwealth v. Singley,* 582 Pa. 5, 868 A.2d 403, 415 (2005), we upheld the trial court's admission, during the penalty phase, of victim impact testimony from the

6. 42 Pa.C.S. § 9711(a)(2), *as amended,* 1995, October 11, P.L. 1064, No. 22 (Special Session No.1), effective in 60 days. The amendment applies only to sentences imposed for offenses committed on or after the effective date. Comment to 42 Pa.C.S. § 9711, Act 1995–22; *Tedford,* 960 A.2d at 40 n. 28; *Commonwealth v. Fisher,* 545 Pa. 233, 681 A.2d 130, 145 n. 7 (1996).

father and the fiancée of a murder victim. Specifically, the victim's father testified that the death of his son, who was childless, had prevented continuation of the family name. *Id.* at 414. The victim's fiancée testified regarding her personal involvement in an award ceremony sponsored by the victim's employer in memory of the victim, and regarding the effect of the murder on her teenage son, on her relationship with her son, and on her own anger-management issues. *Id.* at 415. This Court concluded that the witnesses' respective statements were "an individualized and subjective commentary on the consequences" of the murder, and thus were properly admitted during the penalty phase as victim impact testimony. *Id.*

▬ In contrast to victim impact testimony, life-in-being testimony *is* admissible during the guilt phase of a murder trial. Life-in-being testimony is proffered to show that the victim was alive at a time prior to the murder, and thus it is relevant to the first element of murder, *i.e.,* that a human being was unlawfully killed. *See, e.g., Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 237 (2006) (upholding as proper life-in-being testimony the testimony of the victim's mother that the victim was alive and well prior to the date of his murder and that she identified his dead body at the medical examiner's office); *Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592, 602 (2000) (concluding that testimony as to the ages and physical characteristics of two victims, their clothing at the time of disappearance, and the last sightings of the victims "demonstrated that each victim was a life in being and was elicited for the purpose of placing the disappearances of the victims in the proper time frame and identifying them by clothing and appearance.").

This Court has made clear, however, that the manner of presenting life-in-being evidence is subject to some restraints. In *Commonwealth v. Rivers,* 537 Pa. 394, 644 A.2d 710, 716 (1994), we concluded that the admission of a photograph of the victim, taken prior to her death, as life-in-being evidence was erroneous. We reasoned that the existence of the victim as a life-in-being had already been established by the testimony of

two witnesses that the victim was alive on the day before her body was discovered and by the coroner's testimony that her death resulted from beating and stab wounds. We concluded that the photograph was proffered solely to engender sympathy for the victim, and was irrelevant to the central issue at trial, *i.e.*, the guilt or innocence of the defendant. Although we concluded that admission of the photograph was improper and irrelevant, we further held that the error was harmless given the overwhelming evidence of the defendant-appellant's guilt. *Id.*

Turning to the case before us, we hold that Mrs. Cassidy's testimony went beyond that which was admissible to establish life-in-being, and it assumed the character of victim impact evidence, which is inadmissible during the guilt phase of trial. Accordingly, the trial court erred by admitting the testimony during the degree-of-guilt phase of Appellant's trial.[7]

Although we conclude that Mrs. Cassidy's testimony was inadmissible at the point in the proceedings at which it was admitted, we decline to hold that Appellant is entitled to relief because any error was harmless. "An error is harmless when the Commonwealth can establish that the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1062–63 (2001). The evidence that Appellant acted with willful, deliberate, and premeditated intent and with malice to kill Officer Cassidy was overwhelming. Because the murder was caught on the surveillance videotape, the jury actually saw Appellant turn and step toward Officer Cassidy as the officer entered the doorway to the Dunkin' Donuts, and the jury

7. Our holding should not be taken to imply that life-in-being testimony is never relevant to or never admissible in the degree-of-guilt phase of a murder trial. That issue is not before us. Here, we simply conclude, similar to our conclusion in *Rivers, supra,* that Mrs. Cassidy's emotional and heart-rending testimony was proffered primarily to engender sympathy for the fallen officer and his family.

actually saw Appellant raise his gun and aim at the officer. Other evidence established that Appellant fired a bullet into Officer Cassidy's forehead at close range, approximately three feet. As Appellant fled the scene, he had the wherewithal to bend to the floor to take the officer's gun. The evidence was graphic and powerful that Appellant acted with malice as well as with willful, deliberate, and premeditated intent to kill, and it strongly refuted Appellant's defense that he shot the officer in a surprised, reflexive panic.

Furthermore the trial court clearly instructed the jury that it must not decide the case based on sympathy for Officer Cassidy or his family. The court's instruction at the beginning of the trial, before any testimony had been presented, was as follows:

> You are to decide this case based on the evidence, not based on sympathy for the victims in these various cases, not based on sympathy for the family of fallen Police Officer Charles Cassidy. You are to base your decision on the evidence you hear from the witness stand. You are not to base it on any sympathy you feel for [Appellant]. You have to be objective. You have to decide this case solely on the evidence and the evidence alone.

N.T. Trial, 11 /12/09, at 17–18.

The trial court reiterated this instruction at the close of the testimony. Mrs. Cassidy was the final Commonwealth witness, and the defense did not present any witnesses, so the trial court delivered the following instruction the day after Mrs. Cassidy's testimony.

> We want people who can be objective. So you can't be prejudiced or influenced by any bias against [Appellant] or any empathy toward [Appellant] nor can you be swayed by sympathy for ... Officer Cassidy or for Officer Cassidy's family. ...

> You have to judge this case on the evidence which you heard and after due deliberations, you should find the facts exclusively on that evidence and apply those facts to the law that

I am about to give you, fit them together and then render your verdict in accordance with the law and the facts. *Id.*, 11/19/09, at 125–26.

We presume that the jury follows the court's instructions. *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 296 (2011); *Commonwealth v. Williams*, 578 Pa. 504, 854 A.2d 440, 447 (2004).

Given the overwhelming and graphic evidence of Appellant's specific intent to kill Officer Cassidy and the trial court's clear and repeated instructions to the jury to decide the case objectively based on the evidence, we conclude that the error in the admission of Mrs. Cassidy's testimony was harmless beyond a reasonable doubt. Accordingly, Appellant is entitled to no relief on his third issue.

### Remorse

In Appellant's fourth and final issue, he claims that the prosecutor engaged in misconduct during the penalty phase by telling the jury that Appellant had never expressed remorse, when the Commonwealth allegedly was well aware that Appellant had apologized on national television after being captured in Florida and also that he had expressed remorse in his written, signed statement of confession to police. Appellant's Brief at 27. Appellant accuses the Commonwealth of "disingenuousness," which denied him a fair trial by an impartial jury. *Id.* In this challenge, Appellant provides only one citation to the notes of testimony, which in proper context is as follows:

The Supreme Court of Pennsylvania has said *that I can comment on the lack of remorse of a Defendant* and I am just going to briefly do that, not in a lot of detail at all. The only thing you heard about that in this case is that little thing when [Appellant] blurted out the other day I am sorry, Mrs. Cassidy.[8] If he was really sorry, go back to the facts of the case.

8. Immediately after Mrs. Cassidy had testified on direct examination during the guilt phase of trial and defense counsel had declined to ask her any questions, Appellant had stated "I apologize, Miss Cassidy."

Even think about something that came out at the penalty hearing, what did [Appellant] do after this murder other than checking on his job application? He went to South Philly and went trick-or-treating with his cousin. He was real sorry for what happened.... He is bragging to his friends I want to kill—to Herb Hill, the Correctional Officer, and to his cousin, Hakim, I am going to kill another cop. There is going to be a mess. Does that sound like somebody who is sorry? I would suggest to you not.

Now, if somebody would like to suggest to you that [Appellant] expressed his regret, his remorse by pleading guilty in this case and admitting guilt to the charges, I would suggest to you that is not mitigation.

N.T. Penalty Phase, 11/24/09, at 32–33 (Commonwealth Closing Argument) (emphasis added to portion specifically cited by Appellant in his brief at 27) (footnote added).

In response to Appellant's claim of misconduct, the Commonwealth raises three arguments. First, the Commonwealth asserts that Appellant has waived any claim of error with regard to the prosecutor's comments on remorse because he failed to make a contemporaneous objection. Commonwealth's Brief at 32–33 (citing Pa.R.A.P. 302(a), which provides that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"). Second, the Commonwealth points out that neither the televised interview nor the statement to police, in which Appellant allegedly expressed remorse for the murder of Officer Cassidy, was admitted into evidence or is of record, and thus neither exists for purposes of appellate review.[9] *Id.* at 32 (citing *Commonwealth v. Bracalielly*, 540 Pa. 460, 658 A.2d 755, 763 (1995), for the principles that "appellate courts may only consider facts which have been duly certified in the record on appeal [and an] item does not become part of the certified record by

N.T. Trial, 11/18/07, at 147. Appellant had simply blurted out this comment; he had not been sworn in and he did not testify.

9. Consistent with the Commonwealth's assertion, our review of the entire certified record reveals no indication that these documents are included therein or were ever admitted into evidence.

simply copying it and including it in the reproduced record"). Finally, the Commonwealth argues that Appellant's claim has no merit because the brief comments of the prosecutor concerning remorse were in proper response to the in-court apology Appellant had blurted out after Mrs. Cassidy's guilt-phase testimony and addressed only Appellant's actions shortly after the murder, which actions were of record. *Id.* at 33–34.

The trial court concluded that Appellant waived this issue because he failed to provide any citation to the record to identify where the prosecutorial misconduct allegedly had occurred. Trial Court Opinion at 16 (citing *Commonwealth v. Gooding*, 818 A.2d 546, 552 (Pa.Super.2003)). In addition, as an alternative holding, the trial court found no merit to Appellant's claim, recognizing that a defendant's lack of remorse may be relevant to the determination of mitigating circumstances. *Id.* at 18; *see Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1378 (1991) (holding that the prosecutor did not commit misconduct by commenting during the penalty phase on the appellant's lack of remorse because this was "a factor that legitimately could be weighed by the jury in assessing the presence of any mitigating factors"). Furthermore, in rejecting Appellant's challenge, the trial court relied on *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 449 (1999), wherein this Court held that a prosecutor's "brief comments regarding a defendant's remorse—particularly when it is in response to a defendant's self-centered display of emotion—do not constitute misconduct."

From our review of the record, we conclude that Appellant did not make a contemporaneous objection to the prosecutor's penalty-phase closing argument concerning remorse. Therefore, this issue has been waived. *See* Pa.R.A.P. 302(a); *Commonwealth v. Rivera*, 603 Pa. 340, 983 A.2d 1211, 1229 (2009) ("This Court has held that the lack of a contemporaneous objection constitutes a waiver of any challenge to the prosecutor's closing remarks.") [10] Furthermore, as the trial

10. We reiterate that, in this issue, Appellant alleges prosecutorial misconduct *only* during the penalty phase, specifically challenging only one

court recognized, *see supra*, there is no merit to Appellant's assertion that the prosecutor's penalty-phase comments concerning remorse constituted misconduct.

## Conclusion

 Finally, having determined that Appellant is entitled to no relief on his claims, we must, pursuant to 42 Pa.C.S. § 9711(h)(3), affirm Appellant's sentence of death unless we conclude either that it was the product of passion, prejudice, or any other arbitrary factor, or that the evidence failed to support the finding of at least one aggravating circumstance. Having carefully reviewed the record, we are persuaded that Appellant's sentence of death was not the result of passion, prejudice, or any other arbitrary factor, but rather was grounded in the Commonwealth's evidence. We also conclude that the evidence was sufficient to support each of the three aggravating factors found by the jury, to wit, the victim was a peace officer killed in the performance of his duties, the murder was committed during the perpetration of a felony, and Appellant had a significant history of violent felony convictions. 42 Pa.C.S. § 9711(d)(1), (d)(6), and (d)(9), respectively.

Accordingly, for the foregoing reasons, we affirm Appellant's sentence of death.[11]

Justice ORIE MELVIN did not participate in the decision of this case.

Justice SAYLOR and BAER and Justice TODD join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

sentence in the prosecutor's penalty-phase closing argument, which encompassed 41 pages. *See* Appellant's Brief at 27; text, *supra* (quoting challenged comment in context); N.T., 11/24/09, at 9–50.

11. The Prothonotary of this Court is directed to transmit a full and complete record of this case to the Governor of Pennsylvania, pursuant to 42 Pa.C.S. § 9711(i).

## CONCURRING OPINION

Chief Justice CASTILLE.

I join the Court's mandate of affirmance, and I join the Majority Opinion itself, subject to the following two qualifications.

First, with regard to this Court's self-imposed duty in capital direct appeals to independently review the sufficiency of the evidence for first-degree murder, the Majority confines its review to the evidence introduced at trial, without considering appellant's plea of guilty to murder generally. This Court conducts *sua sponte* sufficiency review even in capital cases where a guilty plea encompasses the lead charge of first-degree murder. *See Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 615 (2010); *Commonwealth v. Singley*, 582 Pa. 5, 868 A.2d 403, 408 (2005); *Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 62 (2003) ("Safeguards exist to protect against an arbitrary imposition of the death sentence.... These protections act to prevent the imposition of a death sentence based solely upon a defendant's proclamation of guilt."). I recognize that, on occasion, the Court has assessed sufficiency without looking to the significance of the plea or the proffer supporting it, including in *Flor*, a decision I joined. Notably, however, both *Fears* and *Singley* looked also to the factual basis for the plea in assessing sufficiency, and this is obviously the better practice. Moreover, cases like this one have convinced me of the wisdom of the position of Mr. Justice Saylor, as outlined in his concurrence in *Commonwealth v. Frey*, 588 Pa. 326, 904 A.2d 866 (2006):

I believe that a logical corollary of the Court's decision to approve the acceptance of pleas of guilt to first-degree murder is the understanding that it simply may not always be possible to conduct traditional sufficiency review relative to the underlying conviction in pleas cases. Accordingly, in such cases it should be appropriate to center the obligatory review on the factual basis for the plea as developed during the course of the plea colloquy, in line with the general

approach for reviewing pleas to other offenses, *see generally Commonwealth v. Hines,* 496 Pa. 555, 437 A.2d 1180 (1981). *Id.* at 875 (Saylor, J., concurring).

Here, appellant entered a plea of guilty to murder generally, and the Commonwealth forwarded a supporting proffer. The proffer and plea alone—whose validity appellant does not challenge—establish all elements of first-degree murder but specific intent: appellant unlawfully killed Officer Cassidy and acted with malice in doing so. In my respectful view, our evaluation of sufficiency must encompass the plea.

Second, I have a number of concerns respecting appellant's claim that the trial court erred in admitting victim impact testimony at the guilt phase, specifically the testimony of Judy Cassidy, the widow of Charles Cassidy, the Philadelphia Police Officer whom appellant murdered. At the outset of its analysis, the Majority poses the question as if the claim is that the entirety of Mrs. Cassidy's testimony was objectionable as victim impact evidence. Majority Op. at 535, 65 A.3d at 331. But, that is not the claim. The Commonwealth did not proffer (or defend) Mrs. Cassidy's testimony as victim impact evidence, and the court below did not admit it as such. As the Majority later recognizes, Mrs. Cassidy's testimony was admitted as life-in-being evidence and appellant never disputed, either below or here, that life-in-being testimony is admissible in a murder prosecution; instead, appellant's claim is that the testimony went beyond life-in-being and encompassed victim impact. Appellant's Brief at 24.[1]

---

1. In the notes of testimony, the references are to "life and being." In modern usage, the common term is "life in being." The references below, while archaic, are not necessarily incorrect:

 Strange as it may seem, for anything appearing in this record, **Guiseppe Visalli may still be in full life and being**.... The circumstances established unmistakably a felonious killing, and from the number and character of the wounds, 16 in all, might be derived every element of murder in the first degree. Was this the body of Guiseppe Visalli? Except as it was so shown, the *corpus delicti* laid in the indictment was not established, and the prisoner ought not to have been convicted.

 *Commonwealth v. Ronello,* 242 Pa. 381, 89 A. 553, 553–54 (1913) (citation omitted and emphasis added) (murder victim consistently referred to in record of trial as "Joe Wilson," but body was never

In resolving the claim, however, the Majority again resorts to a less precise and more absolute approach, apparently concluding that the trial court erred in admitting the entirety of Mrs. Cassidy's testimony. This is obviously incorrect; those aspects of Mrs. Cassidy's testimony encompassing life-in-being were properly admitted, and any error arises only from those aspects implicating victim impact. The job of policing the line between evidence of life-in-being and victim impact testimony obviously falls within the discretion of the trial court. The Majority's inaccurate reframing of the issue necessarily recasts its review of the exercise of the trial court's discretion. Mrs. Cassidy's testimony in fact was. admitted by the court as life-in-being evidence. Appellant's preserved claim that the evidence digressed from life-in-being into victim impact does not alter the purpose for which the evidence was presented and admitted; it is, rather, an objection premised upon speculation at what the jury might do with evidence that was offered for life-in-being purposes but strayed beyond that purpose.[2] This is a much narrower point. If the entirety of Mrs. Cassidy's evidence was both irrelevant and harmless, as the Majority says, then the mere victim impact aspects of the testimony obviously were not prejudicial.

Finally, concerning life-in-being evidence, I write in response to the Majority's notation in a footnote that the Court's holding "should not be taken to imply that life-in-being testimony is never relevant to or never admissible in the degree-of-guilt phase of a murder trial," as "[t]hat issue is not before us." Majority Op. at 539 n. 7, 65 A.3d at 333 n. 7. I could not

positively identified as "Guiseppe Visalli," the name that appeared on the indictment).

**2.** In a footnote that is in some unresolved tension with its analysis in text, the Majority states that it "simply conclude[s] ... that Mrs. Cassidy's emotional and heart-rending testimony was proffered primarily to engender sympathy for the fallen officer and his family." Majority Op. at 539 n. 7, 65 A.3d at 333 n. 7. Although I agree that Mrs. Cassidy's life-in-being testimony spilled over into victim impact, rendering aspects of it objectionable, the trial court never found that such was its "primary purpose," and I do not join in the Majority's speculation concerning the motivation of the Commonwealth.

agree more; indeed, the observation is so much the case that the Majority could ignore this non-issue entirely.

In an attempt to avoid the mischief this unnecessary footnote may invite, I write to explain why I am inclined to believe that it would be strange indeed for a murder defendant to claim—and appellant should be commended for not claiming—that a murder victim's life-in-being can be rendered irrelevant by the defendant's pleading strategy. When Officer Cassidy walked into a coffee shop on the morning of October 31, 2007 and unwittingly happened upon a robbery in progress, he was a person, a human being. He was neither an abstraction nor a mere prop for the future trial of the man who—caught on tape—ambushed and murdered him. Under settled and logical authority, evidence of his life-in-being is admissible at trial.

In this case, the Commonwealth pursued capital murder charges, and when appellant pled guilty to committing the murder "generally," he did not acknowledge guilt of first-degree murder; his plea was strategic (and no doubt wise, given the videotape). Instead, appellant focused on defeating a verdict of first-degree murder or, failing that (as was likely, given the evidence), creating a platform for a penalty phase case in mitigation premised upon acceptance of responsibility. When the defendant insists that the Commonwealth carry its burden to establish the degree of murder to the jury, I do not believe that defense pleading strategy controls the Commonwealth's ability to present its case in full. This case was about murder, so it necessarily encompassed the prior existence of Officer Cassidy.

When a defendant pleads guilty to murder generally, the Commonwealth does not concurrently waive its ability or duty to put on its case and prove the elements of first-degree murder beyond a reasonable doubt, a point this Court has addressed in the capital context: "[T]he Commonwealth has some flexibility in proving its case. *See Old Chief v. United States*, 519 U.S. 172, 186–87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.")." *Commonwealth v.*

*Philistin,* 53 A.3d 1, 14 n. 8 (Pa.2012). Similarly, we have recognized that, "a criminal defendant does not have the right to have all evidence presented against him at trial sanitized of anything that could cause jurors to sympathize with the victim or his family." *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 807 (2007). Indeed, the fact that a person has been killed is rarely challenged in a murder prosecution. And, even aside from the partial guilty plea scenario, in cases where there is a dead body and proof of criminal agency, it costs a defendant nothing to admit or stipulate that the victim has died. I do not believe that pleas or stipulations to the fact of the victim's death render life-in-being testimony irrelevant. Certainly, the trial court, in its discretion, can rein in and channel the Commonwealth's proof. Nevertheless, evidence going to elements of the crime placed before the jury is not inadmissible, even if certain of the elements are strategically uncontested.

## CONCURRING OPINION

Justice EAKIN.

I agree with the majority's conclusion that Mrs. Cassidy's testimony was harmless victim impact evidence. As *Commonwealth v. Rivers,* 537 Pa. 394, 644 A.2d 710, 716 (1994), predates the statutory construct regarding victim impact evidence and only deals with life-in-being testimony, I find the discussion of such testimony to be unnecessary *dicta.*