J-S46036-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WAYNE SMITH | : | |
| | : | |
| Appellant | : | No. 3254 EDA 2018 |

Appeal from the PCRA Order Entered October 24, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011844-2010

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED SEPTEMBER 24, 2019**

Appellant, Wayne Smith ("Appellant" or "Smith"), appeals from the order entered October 24, 2018, that denied his first petition filed under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

The facts underlying this appeal are as follows:

[Appellant] was charged with murder and related offenses for his role in a street brawl on the evening of June 5, 2010. . . .

The record reflects that David Dial uttered a racial epithet denigrating Smith's sister, Taneka,[2] and Jimmy Schmidt.  A street fight ensued between two duos:  (1) Smith and Schmidt and (2) Dial and Tyrell Harris (the victims).  Jamial Burley soon joined the fight on the side of Smith and Schmidt. . . . Smith

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541–9546.

[2] Hereinafter, Taneka Smith will be referred to as "Taneka."

pulled out a gun and shot Dial four times and Harris once. Dial died; Harris was hospitalized with a gunshot wound to his upper back.[3]

That night, Smith had been driving a car owned by his sister, Latia. Latia called police to report that her car was stolen. Police officers arrived at the house where Smith, Taneka and Latia lived with their mother. The officers realized that family members had been involved in the shooting incident and told Smith's mother that they wanted to talk with everyone in the house. Smith's mother called Smith and Taneka and told them that detectives wanted to talk to them. Taneka, Jimmy Schmidt, Krysta Mitchell, and Smith's mother went to the police station. Smith did not go to the police station but instead went to his aunt's house to avoid the police.

On June 6, 2010, the morning after the shooting, Schmidt gave a written statement to police identifying Burley as the shooter.

***Commonwealth v. Smith***, No. 2304 EDA 2015, unpublished memorandum at 1-2 (Pa. Super. filed August 9, 2016). Mitchell also gave a written statement to police, asserting, in part: "Taneka asked [Schmidt] who shot the boy. . . . [Schmidt] was saying it was a young boy from the jungle" – *i.e.*, from another neighborhood. Commonwealth's Exhibit 2 at 3. When asked, "Did [Schmidt] tell you the young boy's name?", Mitchell answered "No." ***Id.***

One day later, on June 7, 2010, Jamella Shaw, an eyewitness to the shooting, gave a statement to police that she saw Smith shoot the victims. After obtaining Shaw's statement, Detective [Joseph] Bamberski obtained a second verbal statement[4] from

---

[3] "On December 5th, 2014, Tyrell Harris died in a car accident." Trial Court Opinion, filed August 31, 2015, at 3 n.2 (citing N.T., 1/23/2015, at 140).

[4] Schmidt "refused to give a formal written statement identifying" Appellant. ***Id.*** (citing N.T., 1/23/2015, at 211-12, 214-19, 222, 225).

Schmidt on June 25, 2010. In this second statement, Detective Bamberski later testified, Schmidt recanted his first statement incriminating Burley and claimed that Smith was the shooter. Two months later, Schmidt died in an unrelated incident.

On July 13, 2010, police detectives interviewed Burley. At first, Burley said he did not know anything about the shooting. But when detectives showed him Schmidt's statement identifying him as the shooter, Burley stated that he saw Smith shoot the victims. After Burley's interview, police arrested Smith.

*Smith*, No. 2304 EDA 2015, at 2-3; *see also* Trial Court Opinion ("TCO"), filed August 31, 2015, at 6 (citing N.T., 1/22/2015, at 300, 304-05, 308-11, 321-22; N.T., 1/23/2015, at 56, 61-63, 68-69, 81-82, 98, 100).

During *voir dire*, the trial court instructed the panel: "Statements and arguments of lawyers are not evidence in a criminal trial[.]" N.T., 1/21/2015 a.m., at 12.

After jury selection but out of the presence of the jury, the Commonwealth asked the trial court's permission to reference Schmidt's oral statement to police where he recanted his identification of Burley as the murderer and implicated Appellant instead in order to explain why the police subsequently obtained a statement from Burley. N.T., 1/21/2015 p.m., at 5-7. The Commonwealth agreed to a cautionary instruction explaining the limited purpose of this evidence, and the court authorized this use. *Id.* at 7.

At trial, during its opening statement, the Commonwealth told the jury:

[The] police had Jimmy Schmidt . . . and they talk to him and he says Jamial Burley did it. Then they release him, talk to [Shaw] who is someone completely independent that has no dog in this

fight, that wasn't involved, and then they go back to [Schmidt] who says, yeah, I lied about who did it.

*Id.* at 46. During the opening statement for the defense, trial counsel stated: "Now, you heard [the Commonwealth] say that Jimmy Schmidt says it's Jamial Burley and then at a later point in time when he's confronted, he says, oh, it's my client. You pay attention to whether or not that information is reliable." *Id.* at 57.

The Commonwealth began its case in chief with the testimony of Dr. Albert Chu, Assistant Medical Examiner, who determined that "Dial had suffered four gunshot wounds[.]" TCO, Aug. 31, 2015, at 3 (citing N.T., 1/21/2015 p.m., at 66, 69, 71-72, 118, 120-22). The Commonwealth then presented the testimony of Officer Fahim Ahmed, the first officer to arrive at the scene of the crime, who attested that, on June 5, 2010, at approximately 11:45 P.M., while on routine patrol at the intersection of Chew Avenue and Rittenhouse Street, he heard three to five rapid gunshots coming from the south. N.T., 1/21/2015 p.m., at 86-87, 90; *see also* TCO, Aug. 31, 2015, at 2. The officer continued that he travelled in the direction of the gunshots and, when he arrived at the area of Chew Avenue and Woodlawn Street, he encountered Harris, who had blood on him and told Officer Ahmed that he had been shot and could not breathe. N.T., 1/21/2015 p.m., at 88-89; *see also* TCO, Aug. 31, 2015, at 2.

> Detective [James] Dunlap created a compilation video [from three different surveillance videos in the area of the murder] that shows at 11:38 p.m., Dial, Harris, Jimmy Schmidt, and

[Appellant] get into a fist fight inside H&M Deli. [Appellant] fights with Harris and Schmidt fights with Dial inside the deli. Tameka . . . enters the deli and attempts to break up the fight. The men spill out of the deli and walk southbound on Chew Avenue. At 11:45 p.m., the video depicts a group of men running northbound on Chew Avenue and the police arriving within a few seconds. At 11:51 p.m., the video shows Jamella Shaw walking northbound on Chew Avenue.

TCO, Aug. 31, 2015, at 4 (citing Commonwealth Exhibit 42; N.T., 1/22/2015, at 8, 10, 12, 14, 20-37).

Shaw and Burley testified for the prosecution, and both identified Appellant as the shooter. N.T., 1/22/2015, at 99 ("Q. Who is shooting David? [Shaw:] Wayne."), 105 ("Q. Are you sure that it was Wayne who was the one shooting David?" [Shaw:] Yes."), 281 ("Q. Who was the person with the gun firing? [Burley:] Wayne Smith.").

"On cross-examination, trial counsel attempted to impeach Shaw's credibility by eliciting that, prior to the shooting, Shaw consumed benzodiazepine, marijuana, and approximately two cups of cognac, thereby impairing her ability to identify [Appellant] as the perpetrator." PCRA Court Opinion ("PCO"), filed October 24, 2018, at 14-15 (citing N.T., 1/22/2015, at 215-19). On cross-examination, Shaw also stated that she hid behind an automobile "[w]hen [she] heard the shots." N.T., 1/22/2015, at 192. "The Commonwealth responded by presenting Shaw's statement to police, wherein she identifies him as the shooter." PCO, Oct. 24, 2018, at 15 (citing N.T., 1/22/2015, at 245-47). By reading her statement, Shaw clarified that

she "heard gunshots[,]" "turned around," saw Dial "getting shot" by Appellant, and then "got behind a car[.]" N.T., 1/22/2015, at 247.

> During Burley's cross-examination --
>
> trial counsel elicited that on December 14, 2014, . . . more than two years after he first implicated [Appellant] . . ., Burley spoke to a private investigator. Trial counsel further elicited that, during the conversation, Burley allegedly indicated that [Appellant] was innocent . . . and expressed his intention to testify consistently with their conversation. Burley explained that he did so in hopes that, by testifying favorably for [Appellant], the threats would cease and he would be able to return to his neighborhood. Burley had previously testified against [Appellant] and identified him as the shooter during . . . the preliminary hearing[.]

PCO, Oct. 24, 2018, at 16 (citing Defense Exhibit 4; N.T., 1/23/2015, at 54-64). "On redirect examination, Burley testified that he started receiving threats in the neighborhood after he testified against [Appellant] during a prior proceeding in September 2012, and received information JR[5] placed a $20,000 bounty on his life, preventing him from returning home." *Id.* at 15 (citing N.T., 1/23/2015, at 89-90). The trial court then gave the following instruction:

> This testimony is relevant because it affects the credibility of the witness, but at this point I have no evidence before me to suggest that in any way this defendant was involved in any of this. So you take that for what it's worth.
>
> What people believe is happening or what they think they believe or know to be happening under certain circumstances can affect their credibility. So I'm instructing you now and I'll

---

[5] The identity of "JR" is discussed in more detail below.

give you further instructions about this that this testimony is relevant for the effect that it may or may not have on the witness and his credibility, but again at this point there's no testimony -- while there was just an answer that these individuals know each other, I just want you to understand there's no testimony ascribing any of that to this particular defendant and you cannot consider this evidence in any way to suggest that.

N.T., 1/23/2015, at 90-91.

Detective Bamberski testified "about Schmidt's second statement, in which Schmidt recanted his prior accusation against Burley and named Smith as the shooter[.]" *Smith*, No. 2304 EDA 2015, at 4. Appellant objected to this testimony as "inadmissible hearsay." *Id.* "The trial court overruled Smith's hearsay objection and instructed the jury that it could not consider this statement for its truth but only to explain the course of the police investigation." *Id.*

> The defense presented testimony from . . . Robert Dixon, Esquire[.] . . . Robert Dixon, Esquire was contacted by [Appellant] shortly after the murder. Dixon attempted to arrange to have [Appellant] give the statement to police, but he was told not to have [Appellant] come in. After the warrant was issued for [Appellant]'s arrest, Dixon arranged for [Appellant] to surrender.

TCO, Aug. 31, 2015, at 6-7 (citing N.T., 1/26/2015, at 31-32, 38, 47-48).

Mitchell also testified for the defense. Before her testimony, the Commonwealth addressed the trial court on the issue of Schmidt's out-of-court statement to Mitchell:

> [THE COMMONWEALTH:] In . . . Mitchell's statement she states that she was asking Jimmy Schmidt later that night of the incident what happened and -- well, Taneka had asked him what

happened and that [Schmidt] said it was a young boy from the jungle that did it.

THE COURT:    Okay.  I don't think [trial counsel] will attempt to elicit that.

[TRIAL COUNSEL]:    No.

N.T., 1/26/2015, at 6.  Mitchell's direct examination testimony included the

following:

[TRIAL COUNSEL:]    After you guys came around the corner and [Taneka] spoke with somebody, what did you guys do then?

A.    We then drive off to look for [Schmidt] or [Appellant].

Q.    Where do you go, if you know?

A.    We drive down the block that like curves into Boyer [Street], I'm not sure what that block is, and we run into [Schmidt] who is . . . breathing hard like he was just running and like he had blood all on his shirt and he was out of breath.

Q.    When you ran into [Schmidt], could you tell whether or not he had any injuries?

A.    No, I didn't see any injuries, but I seen blood, so --

Q.    Okay.  So what happens next?

A.    So [Schmidt] gets into the car and he tells us –

[COMMONWEALTH]:    Objection.

THE COURT:    Sustained.

*Id.* at 101-02.

Taneka also testified on behalf of the defense.

On direct examination, [Taneka] testified that Philadelphia Police would not take her  statement that her brother was not involved in the murder for which he was arrested.   [On cross-examination, t]he prosecutor impeached this testimony by eliciting that [Taneka], when questioned by Montgomery County Police officers conducting an unrelated investigation, failed to proclaim [Appellant]'s innocence[.]

- 8 -

PCO, Oct. 24, 2018, at 17-18. The following exchange occurred:

> Q. Do you see that? [Montgomery County detectives] brought up your brother like where is your brother and you mentioned that he got arrested for a homicide; right?
>
> A. Yes, yes.
>
> Q. While these detectives were treating you nice, did you ever tell these detectives that your brother [Appellant] couldn't have done it in this statement?
>
> A. I'm sorry, say it again.
>
> Q. In this statement do you ever tell detectives what you say now that the other detectives wouldn't take from you, Phil[adelphia] detectives, did you try to tell them --
>
> [DEFENSE COUNSEL]: Objection, judge.
>
> BY [COMMONWEALTH]:
>
> Q. -- try to tell them about your brother's case?
>
> THE COURT: I'll overrule that.
>
> THE WITNESS: I'm sorry, do I ever tell them about --
>
> BY [COMMONWEALTH]:
>
> Q. Yes. They brought up where is your brother right?
>
> A. I didn't think -- I guess I didn't think it was necessary. I don't even really remember this, like everything I said at this -- during this time. I don't remember everything.
>
> Q. Well, that's what it says in the statement; right?
>
> A. Yes, you're right.

N.T., 1/26/2015, at 250-52.

Robert Myers also testified for the defense. Before his testimony, trial counsel represented to the trial court that "Myers was being called to offer an inconsistent statement that Burley had made on a prior occasion about the identity of the shooter." PCO, Oct. 24, 2018, at 19. Myers "testified

- 9 -

that about two or three days after the murder he was speaking with his friend, Burley, who explained that he did not know who shot Dial." TCO, Aug. 31, 2015, at 7 (citing N.T., 1/28/2015, at 20-21). Myers's direct testimony also included the following:

> Q. Did you ever have any phone conversations relative to this particular incident of June 5th, 2010?
>
> A. Yes, sir. I seen [Appellant] here at [Criminal Justice Center] in the basement about two years ago and we were talking about his case and it was like a real emotional situation and being as though I knew about the situation, I knew the people directly involved, I wanted to reach out to [Burley], so I fabricated a story against [Appellant] to try to get his attention.
>
> Q. All right. When you say fabricated a story against [Appellant], tell us exactly what you fabricated.
>
> A. I think I told my child's mother to tell [Burley] to get in contact with me because me and [Appellant] was beefing about this situation.
>
> Q. When did that occur, do you remember?
>
> A. I don't remember the exact date, but it was in, though.
> . . .
>
> THE COURT: So from jail you called your girlfriend to say that you had a problem with [Appellant] in prison?
>
> THE WITNESS: No. I called my girlfriend and said that I ran into [Appellant] and we had a problem at court.

N.T., 1/28/2015, at 22-23.

Appellant testified in his own defense. During his direct examination, the following dialogue occurred about the identity of "JR":

> Q. Okay. Now, did you know anybody by the name of JR?
>
> A. I know who JR is, yes.

Q.    Is that a friend of yours?

A.    He's not a friend of mine.

Q.    Is he from your age group?

A.    I never had a conversation with JR in my entire life.

*Id.* at 190.   On cross-examination, the Commonwealth further questioned

Appellant about "JR":

Q.    [JR] was kind of higher up on the drug chain . . . not a street seller, but a little higher up on the drug chain . . . ?

A.    You are correct about that.

Q.    [Schmidt] sold drugs for JR?

A.    Yes, he did.

Q.    Bryant Nelson sold drugs for JR?

A.    From the testimony that he just gave, that's when I found out, yes, he did.

Q.    Well, you live in that neighborhood; right?   Everyone knows everyone; right?

A.    But I don't know who sells drugs for who.  I know he sells drugs, but I don't know that he sell drugs for JR.

Q.    And Jamial Burley sold drugs for JR?

A.    Ma'am, I don't know. . . . I know that he was a big-time drug dealer, but I didn't know that he controlled the area, no, I didn't. . . .

Q.    All right.   So I just asked you, JR controls the area including Blakemore [Street] and Woodlawn [Street], right, or who sells drugs in that area?

A.    Did you ask me that?  Yes, you asked me that.

Q.    And he controls that; right?

A.    Ma'am, I don't know, ma'am. . . .

Q. All right. Well, you actually have been arrested and convicted for selling drugs, crack cocaine, at Blakemore and Woodlawn, have you not?

A. It was not Blakemore and Woodlawn, but, yes, I have a drug conviction from that area. . . .

Q. And the date that you were arrested for selling crack cocaine on that street was November 22nd, 2009; is that right?

A. Yes, you're correct.

Q. So that would be approximately six months before this incident; right?

A. Yes, you're correct.

*Id.* at 195-98. The Commonwealth then presented a rebuttal witness, Officer Frank Bonett, "who testified that he had previously observed [Appellant] in known drug distribution with JR, Bryant Nelson, and up to fifteen more people on a regular basis." PCO, Oct. 24, 2018, at 23 (citing N.T., 1/28/2015, at 259-61).

During its closing argument, the Commonwealth referred to Appellant's failure to go to the police station with his mother, Taneka, Schmidt, and Mitchell: "If that's your story, go down and tell. He doesn't want to. He lawyers up.[6] He hides." N.T., 1/28/2015, at 355.

On January 29, 2015, Appellant was convicted of murder of the third degree, carrying firearms in public in Philadelphia, possessing instruments of

_____

[6] Appellant acknowledges that he "sought counsel in the time period following the incident, but before an arrest warrant was issued." Appellant's Brief at 15.

crime, and aggravated assault.[7]  On April 2, 2015, he was sentenced to an aggregate judgment of sentence of 25 to 50 years of confinement.

Appellant filed a direct appeal, challenging the admission of "Detective Bamberski's testimony about Schmidt's second statement, in which Schmidt recanted his prior accusation against Burley and named Smith as the shooter [as] inadmissible hearsay" and challenging the trial court's failure to declare a mistrial *sua sponte* when evidence of Appellant's pre-arrest silence was introduced by the Commonwealth, amongst other claims.  **Smith**, No. 2304 EDA 2015, at 3-4.  On August 9, 2016, this Court affirmed the judgment of sentence.  **Id.** at 1.  Appellant filed a petition for allowance of appeal to the Supreme Court of Pennsylvania, which was denied on January 10, 2017.

On December 14, 2017 Appellant filed his counseled, first, timely PCRA petition, arguing that he was denied effective assistance of counsel, a fair trial, and due process when trial counsel:  (a) (i) failed to motion *in limine* to exclude evidence of Appellant seeking the advice of counsel prior to his arrest and his pre-arrest silence, (ii) "elicited testimony on this subject from" Dixon, (iii) failed to object to the Commonwealth's cross-examination of Dixon, and (iv) failed to object to the Commonwealth's comments on these matters during its closing argument; (b) failed to object to the prosecutor's opening statement; (c) failed to articulate a coherent defense theory of the

---

[7] 18 Pa.C.S. §§ 2502(c), 6108, 907(a), and 2702(a), respectively.

case; (d) suggested to the jury that Schmidt's statement should be considered for its truth and elicited the full details of the statement during his cross-examination of Detective Bamberski; (e) failed to object to the improper impeachment of Taneka; (f) "failed to object to the questioning of [Appellant] as to his prior drug-related conviction and the rebuttal testimony by" Officer Bonett; (g) failed to present evidence from Mitchell that Schmidt stated to her that Burley shot the victim; (h) failed to listen to a recorded telephone conversation between Myers and Myers's girlfriend prior to presenting Myers as a defense witness; (i) failed to object to Burley's testimony that he could not return to the neighborhood; and (j) failed to object to "repeated use" of Shaw's prior consistent statements. PCRA Petition, 12/14/2017, at 2-6 ¶¶ 10.a.-10.j.

On June 27 and July 18, 2018, the PCRA court held evidentiary hearings. Trial counsel testified that his theory of the case was that Burley was the shooter. N.T., 6/27/2018, at 6. Trial counsel confirmed that the Commonwealth had provided him with a compact disc with audio recordings of prison telephone calls made by Myers, but the disc did not work. *Id.* at 50-51. When asked if he was provided with transcripts of the recordings, he answered that he was "not sure." *Id.* at 51. However, trial counsel knew that the recordings included Myers telling his girlfriend that Appellant had threatened or intimidated him. *Id.* at 52. After trial counsel confirmed that

he had reviewed Mitchell's statement and interviewed her prior to trial, *id.* at 75-76, the following exchange occurred:

> Q.     And if Miss Mitchell had said to you, "Oh, wait.  As a matter of fact, [Schmidt] said to me that it was Jamal Burley," is that information that you would have brought to the Judge or the DA's attention because it was inconsistent with the statement?
>
> A.     I would have.

*Id.* at 76.  When asked to describe his opening statement, trial counsel stated:  "[W]hen I'm not sure exactly how things are going to come out, I give what I call a vanilla opening where I just highlight, for example, that it is the Commonwealth's burden.  Keep an open mind.  Don't jump to any hasty conclusions." *Id.* at 90.

Mitchell also testified during the PCRA hearings.  When asked what she would have answered about what Schmidt said when he entered the car if the trial court had not sustained the Commonwealth's objection, Mitchell said:  "I would have stated that [Schmidt] said who shot [Dial], which was some guy from the jungle, his name is Jamal I believe what his name." *Id.* at 125.

On October 24, 2018, the PCRA court entered an order denying Appellant's petition, along with an accompanying memorandum opinion. On November 14, 2018, Appellant filed this timely appeal.[8]

Appellant presents the following issue[9] for our review:

> Whether Appellant, Wayne Smith, is entitled to relief under the [PCRA] due to the pervasive and prejudicial deficient performance of trial counsel.

Appellant's Brief at 4 (unnecessary capitalization omitted).

---

[8] The PCRA court did not order and Appellant did not file a statement of errors complained of on appeal. On November 14, 2018, the trial court entered an opinion stating that its memorandum opinion accompanying its PCRA order dated October 24, 2018, would serve as its opinion for purposes of Pa.R.A.P. 1925(a).

[9] While Appellant only lists one question in his brief's statement of questions involved pursuant to Pa.R.A.P. 2116, the "Argument" section of his brief is divided into ten separate subsections. Appellant hence has violated Pa.R.A.P. 2119(a), which mandates that "argument shall be divided into as many parts as there are questions to be argued." Although we have chosen to apply our rules liberally and thus to address Appellant's substantive issues, we admonish Appellant and, more importantly, his counsel, and we remind them of the following:

> The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review as guaranteed by Article V, Section 9 of our Commonwealth's Constitution may be properly exercised.

*Commonwealth v. Briggs*, 12 A.3d 291, 343 (Pa. 2011).

When reviewing a claim that a PCRA court erred by denying an appellant PCRA relief based upon ineffective assistance of counsel, we consider the following legal precepts:

> We review the denial of PCRA relief to decide whether the PCRA court's factual determinations are supported by the record and are free of legal error. . . .
>
> Counsel is presumed to be effective.
>
> To overcome this presumption, a PCRA petitioner must plead and prove that:  (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error.
>
> A failure to satisfy any of the three prongs of this test requires rejection of a claim of ineffective assistance.

*Commonwealth v. Medina*, 209 A.3d 992, 996, 1000 (Pa. Super. 2019) (internal brackets, citations, and quotation marks omitted) (some additional formatting), *reargument denied* (July 17, 2019).  "[C]ounsel will not be deemed ineffective for failing to raise a meritless claim[,]" including where "there [is] no reasonable basis for trial counsel to object . . . , counsel will not be deemed ineffective for failing to raise a meritless objection." *Commonwealth v. Spotz*, 896 A.2d 1191, 1211, 1247 (Pa. 2006).  We consider the record "in the light most favorable to the prevailing party at the PCRA level."  *Commonwealth v. Stultz*, 114 A.3d 865, 872 (Pa. Super. 2015) (quoting *Commonwealth v. Henkel*, 90 A.3d 16, 20 (Pa. Super. 2014) (*en banc*)).

Appellant catalogs multiple reasons that his trial counsel allegedly was ineffective.  We will consider each in turn.

**Pre-Arrest Silence and Attorney Consultation**

*Commonwealth's Evidence and Argument*

Appellant first contends that he "was denied the effective assistance of counsel when trial counsel failed to protect against evidence and argument by the [Commonwealth] that [Appellant] maintained pre-arrest silence and consulted with counsel before being charged."  Appellant's Brief at 14.

This Court previously considered Appellant's contention that the Commonwealth inappropriately elicited testimony about Appellant's pre-arrest silence and found that claim to be meritless:

> The prosecutor's question was a permissible reference to Smith's efforts to avoid apprehension, not to his silence.  After the shooting, Smith did not go home; he avoided his mother and his sisters.  Evidence of this behavior is admissible and probative of his consciousness of guilt.  ***Commonwealth v.*** [***Charles***] ***Collins***, 269 A.2d 882, 884 (Pa.1970) ("Flight, unlike silence in the face of police questioning, cannot be taken as an assertion of a constitutional right").

***Smith***, No. 2304 EDA 2015, at 14.  Trial counsel thus cannot be deemed ineffective for failing to raise this meritless claim.  ***Spotz***, 896 A.2d at 1211.

As for Appellant's convoluted and undeveloped contention that, even if evidence of pre-arrest silence were admissible, it does not mean that the Commonwealth was permitted to argue that this pre-arrest silence "was evidence of his guilt[,]" Appellant presents no case law or other support for his suggestion that a party cannot argue to a jury that evidence can be

considered for the purpose that it was admitted.  Appellant's Brief at 20.  Any such argument is thereby waived.  ***See, e.g.***, ***Commonwealth v. Spotz***, 18 A.3d 244, 281 n.21 (Pa. 2011) (without a "developed, reasoned, **supported**, or even intelligible argument[, t]he matter is waived for lack of development" (emphasis added)); ***In re Estate of Whitley***, 50 A.3d 203, 209 (Pa. Super. 2012) ("The argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities[; t]his Court will not consider the merits of an argument which fails to cite relevant case or statutory authority" (internal citations and quotation marks omitted)); ***Commonwealth v. Sullivan***, 864 A.2d 1246, 1248-49 (Pa. Super. 2004) (citing ***Commonwealth v. Mercado***, 649 A.2d 946, 954 (Pa. Super. 1994) (failure to provide support for an issue may result in waiver of the claim)) (claims waived, "because none of [the a]ppellant's cited authority addresses" issue raised).

Turning to the Commonwealth's statement that Appellant "lawyers up[,]" we conclude that this comment was made in the context of Appellant's decision not to speak to police at the same time as his friends and family.  N.T., 1/28/2015, at 355.  Accordingly, it was also a permissible reference to Appellant's efforts to avoid apprehension, not to his Sixth Amendment right to counsel, and, consequently, was a proper comment on Appellant's consciousness of guilt.  ***See Commonwealth v.***

*Charles Collins*, 269 A.2d 882, 884 (Pa. 1970). *Ergo*, trial counsel also cannot be found ineffective for failing to raise a meritless challenge the Commonwealth's legitimate remark. *Spotz*, 896 A.2d at 1211.

Even if the Commonwealth's comments were not legitimate, prior to the Commonwealth making its opening, the trial court had instructed: "Statements and arguments of lawyers are not evidence in a criminal trial[.]" N.T., 1/21/2015 a.m., at 12. "We presume that the jury follows the court's instructions." *Commonwealth v. Jordan*, 65 A.3d 318, 334 (Pa. 2013). As the trial court had already instructed the jury on how it should consider the statements of counsel, there was no cause for trial counsel to "protect against" the Commonwealth's remarks any further. *See* Appellant's Brief at 14. Appellant's assertion that trial counsel should have done so lacks arguable merit, and trial counsel cannot be found ineffective for this reason. *Spotz*, 896 A.2d at 1211; *Medina*, 209 A.3d at 1000.[10]

_____

[10] Appellant relies upon *Commonwealth v. Colavita*, 920 A.2d 836 (Pa. Super. 2010). Appellant's Brief at 15, 19. In *Colavita*, the Commonwealth repeatedly commented in its opening statement that the Appellant was "in a lawyer's office" and has "got a lawyer already" or "got a lawyer somehow" less than two days after the murder. 920 A.2d at 841. Like Appellant in the current action, the appellant in *Colavita*, *id.* at 839, contended in a PCRA petition that his trial counsel's failure to object to the Commonwealth's remarks about his consultation with an attorney prior to his arrest constituted ineffective assistance of counsel. Finding no precedential Pennsylvania case law, this Court relied upon *United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3d Cir.), *cert. denied*, 414 U.S. 855 (1973). *See Colavita*, 920 A.2d at 841.

*(Footnote Continued Next Page)*

*(Footnote Continued)* ————————————

> Macon sought *habeas corpus* review in the New Jersey Federal District Court, asserting that the prosecutor's statement about his pre-arrest call to his lawyer penalized the exercise of his Sixth Amendment right to counsel, as applied to the states through the Fourteenth Amendment. . . . 476 F.2d at 615. The District Court denied Macon's petition for writ of *habeas corpus.* . . . [***Id.***] at 613. . . . On review, the Third Circuit reversed the District Court. ***See*** [***id.***] at 616. . . . Analogizing ***Griffin*** [***v. California***, 380 U.S. 609 (1965),] to the case before it, the Third Circuit concluded that, for purposes of analyzing whether a defendant was "penalized" for engaging in constitutionally-protected conduct, there was no meaningful distinction between the right against self-incrimination and the right to counsel in criminal proceedings. . . . The principle espoused in ***Macon***, *i.e.,* that a prosecutor cannot argue that a defendant's constitutionally-protected conduct supports an inference of his guilt, has been adopted by other federal circuit courts. ***See, e.g.***, ***Bruno v. Rushen***, 721 F.2d 1193 (9th Cir.1983); ***accord United States v. McDonald***, 620 F.2d 559 (5th Cir.1980)[;] . . . ***Dean v. Young***, 777 F.2d 1239, 1242–43 (7th Cir.1985).

***Id.*** at 841-43 (emphasis in original).

However, this Court's decision in ***Colavita*** was later vacated by the Supreme Court of Pennsylvania, because this Court's Fourteenth Amendment theory was not argued or preserved by the appellant. ***Commonwealth v. Colavita***, 993 A.2d 874 (Pa. 2010). The Pennsylvania Supreme Court thereby concluded that it could not reach this issue. The precedential value of this Court's ***Colavita*** decision is therefore dubious.

Assuming that this Court could rely upon its opinion in ***Colavita*** without question, we would still find that case distinguishable from the current one. In ***Colavita***, 920 A.2d at 841, the Commonwealth repeatedly drilled into the jurors' minds during its opening statement that the appellant was "in a lawyer's office" and "got a lawyer" prior to his arrest, whereas, in the current appeal, the Commonwealth's closing argument had one, brief reference to Appellant hiring an attorney within the context of Appellant's attempt to avoid apprehension. N.T., 1/28/2015, at 355.

*Dixon's Testimony*

In addition, Appellant alleges that "trial counsel jeopardized these rights [to silence and to counsel] by calling attorney Dixon as a witness with the purpose of explaining something that needed no explanation -- why [Appellant] sought Dixon's representation before he was charged. This entire subject matter was off-limits for the prosecution." Appellant's Brief at 15-16.

After a thorough review of the record and the briefs of the parties, we agree with the analysis of the PCRA court:

> Calling Dixon to testify was a reasonable strategy to counter the Commonwealth's evidence of consciousness of guilt. At trial, Dixon articulated that [Appellant] was cooperative with police and willing to give information prior to his arrest but the police department declined to interview him. Such testimony effectively responded to the Commonwealth's evidence that [Appellant] hid from police and bolstered the [Appellant]'s testimony on the same issue.

PCO, Oct. 24, 2018, at 19 (citing N.T., 1/26/2015, at 29-32). As trial counsel's decision to call Dixon to testify had an "objectively reasonable basis designed to effectuate his client's interest[,]" we must reject Appellant's claim of ineffective assistance. **Medina**, 209 A.3d at 1000.

**Testimony of Robert Myers**

Appellant next argues that "[t]rial [c]ounsel was ineffective in calling the witness, Robert Myers, without first listening to a tape recording of a conversation that was provided in discovery, which seriously impeached his

testimony and which permitted the jury to find that [Appellant] threatened a key witness." Appellant's Brief at 21.

After a thorough review of the record, we agree with the PCRA court that "there is no evidence in the record to support the assertion that [trial] counsel called Myers without knowledge of the contents of the recorded prison phone calls." PCO, Oct. 24, 2018, at 19-20. During the PCRA hearing, trial counsel stated that he knew that, on the recording, Myers told his girlfriend that Appellant had threatened or intimidated him. N.T., 6/27/2018, at 52. As the PCRA court also observes: "In fact, it was [trial] counsel that introduced the evidence of the contents of the prison call in his direct examination, indicating he knew about the call and transcripts and "getting ahead" of the Commonwealth's introduction of it[.]" PCO, Oct. 24, 2018, at 20 (citing N.T., 1/28/2015, at 22-23). Accordingly, Appellant's claim that trial counsel was ineffective for failing to listen to a recording of a telephone call made by Myers from prison is belied by the record and merits no relief.

Appellant tangentially claims that the fact that the Commonwealth "used a transcript of the tape-recorded conversation to inform [its] cross-examination of Myers and failed to provide it to [trial] counsel before he did so" is "[t]roubling[.]" Appellant's Brief at 24. Appellant does not elaborate further nor provide any supportive authority, hence waiving this claim. ***Id.***; ***see Spotz***, 18 A.3d at 281 n.21 (without a "developed, reasoned,

supported, or even intelligible argument[, t]he matter is waived for lack of development"); *see also Whitley*, 50 A.3d at 209; *Sullivan*, 864 A.2d at 1248-49 (citing *Mercado*, 649 A.2d at 954) (claims waived, "because none of [the a]ppellant's cited authority addresses" issue raised). Assuming this contention were preserved, we would still fail to see what harm befell Appellant by the Commonwealth referencing a transcript for its own purposes, that was not handed to the jury, nor how the Commonwealth's decision to transcribe Myers's telephone call was ineffectiveness of trial counsel.[11]

To the extent that Appellant suggests that trial counsel should not have called Myers to testify at all, we agree with the trial court that counsel's action had an objectively reasonable basis designed to effectuate Appellant's interest:

> Trial counsel acted with reasonable strategy in calling Myers to assist in impeaching the credibility of Commonwealth witness Jamial Burley. Trial counsel specifically stated that Robert Myers was being called to offer an inconsistent statement that Burley had made on a prior occasion about the identity of the

---

[11] Furthermore, Appellant's argument seems to be predicated on the assumption that trial counsel did not have a transcript of the call. *See* Appellant's Brief at 21 (trial counsel "never requested another copy or a transcript"); Appellant's Reply Brief at 5 (trial counsel "neither asked for a new copy of the record nor did he request a transcript of the recording"). However, at the PCRA hearing, trial counsel actually stated that he was "not sure" if he received a transcript of the call; he never unequivocally stated that he did not obtain a transcript from the Commonwealth. N.T., 6/27/2018, at 51.

shooter. . . . Trial counsel's strategy to contradict Burley was reasonable, as he was one of the two identification witnesses and had made inconsistent identifications.

PCO, Oct. 24, 2018, at 19. As Appellant has failed to satisfy one of the prongs of the ineffective assistance of counsel test – *i.e.*, "reasonable basis", we must reject his claim of ineffective assistance as it relates to calling Myers to testify. ***Medina***, 209 A.3d at 1000.

Since "[a] failure to satisfy any of the three prongs of this test requires rejection of a claim of ineffective assistance[,]" ***id.***, we need not address Appellant's extensive argument about the prejudice caused him by the Commonwealth's cross-examination of Myers. Appellant's Brief at 21-22, 24; Appellant's Reply Brief at 6-7.[12]

**Schmidt's Statements to Police**

Appellant urges this Court to find that "trial counsel was ineffective in dealing with Jimmy Schmidt's statements . . . to detectives[.]" Appellant's Brief at 25.

_____

[12] To the extent we were to address the prejudice prong, we would briefly note that the jury already knew, without Myers's testimony, that Burley had given inconsistent statements, first saying that he did not know anything about the shooting, then telling police and testifying at the preliminary hearing that he saw Appellant shoot the victims, and later indicating to a private detective that Appellant was innocent. ***See*** PCO, Oct. 24, 2018, at 16 (citing Defense Exhibit 4; N.T., 1/23/2015, at 54-64); ***Smith***, No. 2304 EDA 2015, at 2-4.

- 25 -

*Admission of Detective Bamberski's Testimony about Schmidt's Statements*

Preliminarily, we note that Appellant previously raised challenges to testimony about Schmidt's statements to detectives on direct appeal, and this Court found these claims to be meritless. *Smith*, No. 2304 EDA 2015, at 3-4, 10-11. To the extent that Appellant is now challenging trial counsel's failure to preclude the admission of this same testimony, we conclude that there would have been no merit to such a challenge, and trial counsel cannot be found ineffective for failing to raise meritless claims. *Spotz*, 896 A.2d at 1211.

Additionally, we observe that the trial court "instructed the jury that it could not consider this statement for its truth but only to explain the course of the police investigation." *Smith*, No. 2304 EDA 2015, at 4. Again, we "presume that the jury follows the court's instructions." *Jordan*, 65 A.3d at 334. Thus, we presume that the jury in the current action followed the trial court's instruction and did not consider any evidence of Schmidt's statement to police naming Appellant as the shooter for its truth but only to explain the court of the police investigation. Therefore, we also presume that the references to Schmidt's identification of Appellant as the culprit had no effect upon the verdict; hence, there was not "a reasonable probability of a different outcome[,]" *Medina*, 209 A.3d at 1000, irrespective of how trial counsel was "dealing with" Schmidt's statements. *See* Appellant's Brief at

25. Appellant has thereby failed to establish the third prong of the ineffectiveness test -- prejudice. ***Medina***, 209 A.3d at 1000.

*Reference to Schmidt's Police Statement During Commonwealth's Opening*

Appellant further contends that, even if Schmidt's statements to police were properly admitted, the Commonwealth "referenced Schmidt's accusatory statement in his opening to the jury in [a] manner [that] would be understood by the jury as direct proof that Smith was the shooter." Appellant's Brief at 25 (citing N.T., 1/21/2015 p.m., at 46).[13]  He adds:

> It was not until the testimony of Detective Bamberski on the third day of the trial that the [trial c]ourt first instructed the jury to limit its consideration of the Schmidt statement to how the investigation progressed.  Given the damage already done by the focus on the reliability of the statement at the very start of the trial, this instruction was far too little and far too late[.]

***Id.*** at 25 n.9 (citation to the record omitted).  Appellant continues that trial counsel was ineffective for failing to request a limiting instruction immediately following the Commonwealth's remark, "notwithstanding the

---

[13] Appellant clarifies that he is not alleging that the Commonwealth vouched for the truthfulness of Schmidt in its opening statement.  Appellant's Brief at 27 (citing PCO, Oct. 24, 2018, at 8-9). ***See Commonwealth v. Reid***, 99 A.3d 427, 447–48 (Pa. 2014) ("Generally, a prosecutor commits improper bolstering when it places the government's prestige behind a witness through personal assurances as to the witness's truthfulness, and when it suggests that information not before the jury supports the witness's testimony."); ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1180 (Pa. 2011) ("Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record.").

[Commonwealth]'s earlier concession that a limiting instruction was appropriate." *Id.* at 25 (citing N.T., 1/21/2015 p.m., at 6-12).

The PCRA court concluded that "nothing" in the Commonwealth's opening remarks about Schmidt's statement, quoted above, "implies that Schmidt told the police the truth in his second statement." PCO, Oct. 24, 2018, at 9. Reading these comments in the light most favorable to the Commonwealth as the prevailing party at the PCRA level, we agree. *Stultz*, 114 A.3d at 872. As the PCRA court further explained:

> [The Commonwealth] explains that Schmidt initially identified Burley as the shooter, that another witness later contradicted Schmidt's identification, and when confronted with that contradiction, Schmidt retracted his identification of Burley. At no point did the prosecutor comment on the truthfulness or validity of either Schmidt's original or subsequent statements. For that reason, trial counsel had no basis to object.
>
> Because the prosecutor's opening statement was a proper description of the course of investigation undertaken by police officers in the instant matter, no limiting instruction was necessary. As such, trial counsel cannot be held ineffective for failing to request a frivolous instruction.

*Id.* For these reasons, we concur with the PCRA court that the Commonwealth did not misrepresent the purpose for which Schmidt's statements were being introduced. Accordingly, the underlying legal claim is not of arguable merit, and we consequently reject this allegation of ineffective assistance of counsel. *Medina*, 209 A.3d at 1000.

Assuming we were to accept Appellant's argument that the Commonwealth was implying that the jury should accept Schmidt's identification of Appellant as the murderer for the truth of the matter

asserted, prior to the Commonwealth making its opening, the trial court had instructed: "Statements and arguments of lawyers are not evidence in a criminal trial[.]" N.T., 1/21/2015 a.m., at 12. Again, we "presume that the jury follows the court's instructions." *Jordan*, 65 A.3d at 334. As the trial court had already instructed the jury on how it should consider attorneys' statements as evidence, there was no cause for trial counsel to request another cautionary instruction. Appellant's assertion that trial counsel should have done so lacks arguable merit, and trial counsel cannot be found ineffective for this reason. *Medina*, 209 A.3d at 1000.

### *Reference to Schmidt's Police Statement During Defense Opening*

Appellant further asserts that "[t]he defense opening was . . . flawed in failing to provide a coherent theory of defense." Appellant's Brief at 26 n.10. Appellant specifically adds that trial counsel provided ineffective assistance when he "*invited* the jury to consider" Schmidt's statements as "substantive fact, informing the jury that they would have to determine whether the statement was 'reliable.'" *Id.* at 26 (emphasis in original) (quoting N.T., 1/21/2015 p.m., at 57).

The contested portion of trial counsel's opening is: "Now, you heard [the Commonwealth] say that Jimmy Schmidt says it's Jamial Burley and then at a later point in time when he's confronted, he says, oh, it's my client. You pay attention to whether or not that information is reliable." N.T., 1/21/2015 p.m., at 57.

We agree with the trial court that Appellant's assertion "requires a very generous reading of the statement on [Appellant]'s behalf[,]." PCO, Oct. 24, 2018, at 10, and we must consider the record in the light most favorable to the Commonwealth as the prevailing party at the PCRA level. ***Stultz***, 114 A.3d at 872. In fact, the jury could have easily inferred the opposite of Appellant's reading of this language in trial counsel's opening – *i.e.*, that trial counsel was suggesting that Schmidt's statement was **not** reliable. As Appellant's underlying claim is grounded in a highly questionable interpretation, it is without merit, and we cannot find trial counsel ineffective for making the contested remark. ***Medina***, 209 A.3d at 1000.

Assuming we were to agree with Appellant's interpretation of trial counsel's statement to the jury to "pay attention to whether or not that information is reliable[,]" N.T., 1/21/2015 p.m., at 57, we would still note that, prior to opening statements, the trial court had instructed: "Statements and arguments of lawyers are not evidence in a criminal trial[.]" N.T., 1/21/2015 a.m., at 12. Again, we "presume that the jury follows the court's instructions." ***Jordan***, 65 A.3d at 334. Since we presume that the jury thus did not consider trial counsel's statement that Schmidt's out-of-court statement was "reliable" as evidence, there could not have been a reasonable probability of a different outcome if not for counsel's

comment, and Appellant has therefore failed to establish the prejudice prong of the ineffective assistance test. *Medina*, 209 A.3d at 1000.

Assuming *arguendo* that we accept Appellant's reading of trial counsel's opening statement, somehow accept that the jury considered Schmidt's second statement to police to be reliable, and accept that the jury only made this determination due to the Commonwealth and/or trial counsel telling it during opening statements that they could consider Schmidt's statements as substantive fact despite the trial court's instruction, Appellant has still failed to establish the third prong of the ineffectiveness test -- prejudice. *Id.* Even if the jury had never been told anything about any of Schmidt's statements to police, the evidence would still have been sufficient to convict Appellant.

There is no dispute that Appellant was fighting with the victims immediately before the shooting. *Smith*, No. 2304 EDA 2015, at 1-2. Surveillance footage establishes that this fight occurred seven minutes before Officer Ahmed heard gunshots, according to his testimony. N.T., 1/21/2015 p.m., at 86-90; TCO, Aug. 31, 2015, at 2, 4 (citing Commonwealth Exhibit 42; N.T., 1/22/2015, at 8, 10, 12, 14, 20-37). The three to five gunshots that Officer Ahmed reported hearing is consistent with the testimony of Dr. Chu that Dial had been shot four times, with Harris shot once. N.T., 1/21/2015 p.m., at 86-87, 90; *Smith*, No. 2304 EDA 2015, at

2; TCO, Aug. 31, 2015, at 2-3 (citing N.T., 1/21/2015 p.m., at 66, 69, 71-72, 118, 120-22).

Most importantly, the Commonwealth presented the testimony of two eyewitness, Shaw and Burley, who both identified Appellant as the shooter. N.T., 1/22/2015, at 99, 105, 281.  Surveillance footage confirmed that Shaw was near the scene about six minutes after the shooting occurred.  TCO, Aug. 31, 2015, at 4 (citing Commonwealth Exhibit 42; N.T., 1/22/2015, at 8, 10, 12, 14, 20-37).  Shaw was completely objective, as she was not involved in the fight leading to the shooting, and she had been unwavering in her identification of Appellant as the shooter since her first statement to police. **Smith**, No. 2304 EDA 2015, at 1-2.  Burley had never identified anyone else as the shooter. **Id.** at 3.  Therefore, even if Schmidt's police statements had never been mentioned during trial, this other evidence would have been sufficient to convict Appellant of all charges.  Consequently, there was not a reasonable probability of a different outcome if testimony about Schmidt's police statements had been excluded – let alone if trial counsel had not implied that Schmidt's statements were reliable.  **Medina**, 209 A.3d at 1000.  For that reason, Appellant is unable to establish the prejudice prong of the ineffectiveness test, and, as he cannot satisfy one prong, the entire ineffectiveness claim fails. **Id.**

*Trial Counsel's Cross-Examination of Detective Bamberski about Schmidt*

Appellant argues that, during his cross-examination of Detective Bamberski, "trial counsel brought out even more inculpatory details in Schmidt's accusations" than had been elicited on direct examination and that "this occurred after the trial court had directed the [Commonwealth] to restrict the scope of what the detective was to say about Schmidt's statement." Appellant's Brief at 26 (citing N.T., 1/23/2015, at 219, 238-41). Appellant urges this Court to conclude that trial counsel "committed a fundamental error that opened the door to the jury's consideration of improper evidence of his client's guilt." *Id.*

As explained above, assuming *arguendo* that no indications of Schmidt's statements to police had been given during trial, the evidence would still have been sufficient to convict Appellant. Thus, whether or not trial counsel's questioning of Detective Bamberski introduced more details about Schmidt's statements is immaterial. For that reason, Appellant is unable to establish the prejudice prong of the ineffectiveness test, and, as he cannot satisfy one prong, the entire ineffectiveness claim fails. *Medina*, 209 A.3d at 1000.

## Schmidt's Out-of-Court Statement to Mitchell

Appellant's final contention regarding Schmidt's out-of-court statements concerns trial counsel's response to the trial court's decision during Mitchell's testimony to sustain the Commonwealth's objection before

Mitchell could say what Schmidt told her on the night of the shooting. Appellant's Brief at 29 (citing N.T., 1/26/2015, at 102). Appellant asserts that trial counsel should have argued that Schmidt's statement to Mitchell, which would have implicated Burley as the shooter, "was admissible as impeachment by way of a prior inconsistent statement of a declarant[.]" Appellant's Brief at 29 (citing N.T., 6/27/2018, at 125-26).

Again, Appellant has failed to establish the third prong of the ineffectiveness test -- prejudice. *Medina*, 209 A.3d at 1000. The jury already knew that Schmidt had initially identified Burley as the shooter but recanted. *Smith*, No. 2304 EDA 2015, at 2-4. In other words, the jury was aware of Schmidt's recantation when it rendered its verdict. Consequently, there was not a reasonable probability of a different outcome if testimony of another time that Schmidt had identified Burley as the perpetrator prior to his identification of Appellant as the shooter had been admitted. *Medina*, 209 A.3d at 1000. For that reason, Appellant is unable to establish the prejudice prong of the ineffectiveness test, and, as he cannot satisfy one prong, the entire ineffectiveness claim fails. *Id.*

**Impeachment of Taneka**

Appellant's next ineffectiveness claim is that trial counsel "failed to object to the improper impeachment" of Taneka when the Commonwealth questioned Taneka why she did not mention the current action to Montgomery County detectives even though the current case "had nothing

to do with the Montgomery County case." Appellant's Brief at 32; *see also* N.T., 1/26/2015, at 250-52; PCO, Oct. 24, 2018, at 17-18. This contention is belied by the record, as trial counsel did object to the Commonwealth's impeachment of Taneka, and the Commonwealth overruled that objection. N.T., 1/26/2015, at 251.[14]

To the extent that Appellant suggests that trial counsel should have "renew[ed] the objection as the impeachment by omission proceeded over two full pages of transcript, Appellant's Brief at 33 (citing N.T., 1/26/2015, at 251-54), "[o]nce an issue has been raised, counsel is not required to continue repeating the objection." *Drum v. Shaull Equipment and Supply Co.*, 787 A.2d 1050, 1055 (Pa. Super. 2001) (citing *Collins v. Cooper*, 746 A.2d 615, 619 n. 2 (Pa. Super. 2000) (holding issue not waived by counsel's failure to object during closing argument to opposing counsel's reference to previously disputed testimony already admitted by trial court over counsel's objection)). Additionally, this Court has found that counsel can have a reasonable basis for not repeating an objection to "ensure[] that the [Commonwealth]'s comments were not further highlighted for the jury." *Commonwealth v. Busanet*, 54 A.3d 35, 64 (Pa.

---

[14] In addition, Taneka's answer that she "didn't think it was necessary" to protest Appellant's innocence in the current matter to the Montgomery County detectives investigating a different crime was likely seen by the jury as a sensible answer, and the Commonwealth's questioning failed to impeach Taneka's credibility, anyway. N.T., 1/26/2015, at 251

2012). Thus, Appellant's proposal that trial counsel should have repeated his objection to Taneka's impeachment had no underlying legal merit but had an objectively reasonable basis; trial counsel therefore cannot be considered ineffective for this reason. *Medina*, 209 A.3d at 1000.

### Prior Convictions

Appellant continues that his trial counsel was ineffective for "fail[ing] to object to evidence of [Appellant's] prior drug-related conviction and association with drug dealers." Appellant's Brief at 34.

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. . . . Evidence is admissible if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact—and its probative value outweighs the likelihood of unfair prejudice.

*Commonwealth v. Clemons*, 200 A.3d 441, 474 (Pa. 2019) (citations omitted).

> According to Pa.R.E. 404(b):
>
> (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

"Evidence that might otherwise be inadmissible may be introduced for some other purpose, particularly where Appellant's own testimony 'opens

the door' for such evidence to be used for impeachment purposes." ***Commonwealth v. Murphy***, 182 A.3d 1002, 1005 (Pa. Super. 2018); ***see also*** Pa.R.E. 607(b) ("The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules."). "A litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence. Further, it is noteworthy that trial judges retain wide latitude as to the scope of cross-examination and will not be reversed absent an abuse of that discretion." ***Murphy***, 182 A.3d at 1005 (internal citations and quotation marks omitted).

Appellant's testimony that he did not know JR, did not know that Nelson sold drugs, and did not know who sold drugs in his neighborhood, N.T., 1/28/2015, at 190, 195-97, "open[ed] the door" for impeachment based on his prior involvement in the drug trade. ***Murphy***, 182 A.3d at 1005. Evidence of Appellant's prior conviction for selling crack cocaine in the area six months prior to the murder, N.T., 1/28/2015, at 198, is highly probative of his knowledge of the drug trade in his neighborhood and its participants. ***See Clemons***, 200 A.3d at 474. ***See also*** PCO, Oct. 24, 2018, at 23. Additionally, as the PCRA court stated,

> the Commonwealth . . . was permitted to rebut [Appellant]'s testimony, . . . with the testimony of Officer [Bonett], who testified that he had previously observed [Appellant] in known drug distribution areas with JR, Bryant Nelson, and up to fifteen more people on a regular basis. This evidence directly contradicted [Appellant]'s assertions that he did not associate with JR or the local drug trade. Had counsel objected to the

- 37 -

Commonwealth's examination of [Appellant] or the admission of Officer [Bonett]'s testimony, the objection would have been overruled.

*Id.* (citing N.T., 1/28/2015, at 259-61). Ergo, Appellant's underlying claim is meritless, and trial counsel cannot be deemed ineffective for failing to raise a meritless claim. *Spotz*, 896 A.2d at 1211.

Appellant additionally contends that, assuming *arguendo* that trial counsel "opened the door" for the Commonwealth's cross-examination, he should be found to be ineffective for that reason. Appellant's Brief at 38. Appellant argues that trial counsel "should have refrained from asking about JR, who was entirely irrelevant to the facts of this case, to avoid any possible opening of the door on cross-examination." Appellant's Brief at 38. This argument is waived, because Appellant failed to include it in his PCRA petition. *See* PCRA Petition, 12/14/2017, at 4 ¶ 10.f.

> Regardless of the reasons for [an a]ppellant's belated raising of [an] issue, it is indisputably waived. We have stressed that a claim not raised in a PCRA petition cannot be raised for the first time on appeal. We have reasoned that permitting a PCRA petitioner to append new claims to the appeal already on review would wrongly subvert the time limitation and serial petition restrictions of the PCRA. The proper vehicle for raising this claim is thus not the instant appeal, but rather is a subsequent PCRA petition.

*Commonwealth v. Santiago*, 855 A.2d 682, 691 (Pa. 2004) (internal brackets, citations, and quotation marks omitted); *accord Commonwealth v. Reid*, 99 A.3d 470, 494 (Pa. 2014).

Likewise, Appellant's proposal that trial counsel should have requested a "limiting instruction regarding proper consideration of [Appellant]'s prior

conviction[,]" Appellant's Reply Brief at 15; *see also* Appellant's Brief at 37, is waived for failure to include it in his PCRA petition. *See* PCRA Petition, 12/14/2017, at 4 ¶ 10.f.; *see also Santiago*, 855 A.2d at 691; *Reid*, 99 A.3d at 494.

**Testimony of Jamial Burley**

Appellant's subsequent ineffectiveness claim is that his trial counsel "failed to object to third-party threat evidence" from Burley. Appellant's Brief at 38.

> [Our courts have] permitted the Commonwealth to engage in a line of questioning designed to reveal that a witness changed his testimony for fear of the consequences of testifying truthfully. *See, e.g., Commonwealth v.* [*Rodney*] *Collins*, 549 Pa. 593, 702 A.2d 540, 544 (1997) (recognizing well-established precedent that third-party threats are admissible to explain a witness's prior inconsistent statement).

*Commonwealth v. Thomas*, 194 A.3d 159, 164 (Pa. Super. 2018).

In the current appeal, trial counsel was the one to broach the subject of Burley's visit to a private investigator, because Burley's discussion with the private investigator contradicted his statement to police and his testimony at the preliminary hearing. PCO, Oct. 24, 2018, at 16 (citing Defense Exhibit 4; N.T., 1/23/2015, at 54-64). Trial counsel hence impeached the truthfulness of Burley's police statement and preliminary hearing testimony – reasonable actions for a defense counsel. The Commonwealth's introduction of third-party threat evidence merely underscored that Burley has repeatedly lied about the shooting, and trial

counsel therefore had no reason to object to the introduction of this evidence. *Id.* at 15 (citing N.T., 1/23/2015, at 89-90).

Additionally, Appellant failed to demonstrate prejudice on this claim, because, immediately after the evidence concerning the third-party threats was elicited, the trial court instructed the jury that it could only consider this evidence for purposes of determining Burley's credibility. N.T., 1/23/2018, at 90-91. "We presume that the jury follows the court's instructions." *Jordan*, 65 A.3d at 334. Thus, Appellant has failed to establish two of the prongs of the ineffectiveness assistance test: that counsel's action or inaction lacked any objectively reasonable basis and prejudice. *Medina*, 209 A.3d at 1000. For these reasons, we find that trial counsel was not ineffective for not objecting to third-party threat evidence elicited during Burley's testimony.

**Shaw's Prior Consistent Statements**

Appellant's following challenge is that trial counsel failed to object to the Commonwealth's use of Shaw's prior consistent statements to rehabilitate her credibility after Appellant had alleged that she had a faulty memory due to drug and alcohol use and fabricated that she had been able to see the shooting if she hid behind a vehicle after hearing shots. Appellant's Brief at 40-41; N.T., 1/22/2015, at 192, 247; PCO, Oct. 24, 2018, at 14-15 (citing N.T., 1/22/2015, at 215-19, 245-47). Pa.R.E. 613(c)(1) allows "[e]vidence of a witness's prior consistent statement" to be

admitted "to rehabilitate the witness's credibility . . . to rebut an express or implied charge of . . . fabrication . . . or faulty memory[.]"  Thus, Pa.R.E. 613(c)(1) let the Commonwealth admit Shaw's prior consistent statements to rehabilitate her credibility.  Hence, there was no basis for trial counsel to object to the introduction of Shaw's prior consistent statement, and "as there was no reasonable basis for trial counsel to object . . . , counsel will not be deemed ineffective for failing to raise a meritless objection."  *Spotz*, 896 A.2d at 1247.

## Cumulative Prejudice

Finally, Appellant raises a claim of cumulative prejudice.  Appellant's Brief at 42.

"When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed."  *Commonwealth v. Spotz*, 47 A.3d 63, 129 (Pa. 2012) (citation omitted).

We have held in this memorandum that some of Appellant's claims about Burley's testimony and Schmidt's out-of-court oral statements accusing first Burley then Appellant of the shooting collapse mainly for lack of prejudice.  Assuming we were to be extremely charitable and were to eliminate Burley's testimony and Schmidt's statements from consideration in their entirety, the evidence still would have been sufficient to convict Appellant.  There is no dispute that Appellant was fighting with the victims

- 41 -

immediately before the shooting. *Smith*, No. 2304 EDA 2015, at 1-2. Surveillance footage establishes that this fight occurred seven minutes before Officer Ahmed heard gunshots. N.T., 1/21/2015 p.m., at 86-90; TCO, Aug. 31, 2015, at 2, 4 (citing Commonwealth Exhibit 42; N.T., 1/22/2015, at 8, 10, 12, 14, 20-37). The Officer Ahmed's testimony that he heard three to five gunshots is consistent with the testimony of Dr. Chu that Dial had been shot four times, with Harris shot once. N.T., 1/21/2015 p.m., at 86-87, 90; *Smith*, No. 2304 EDA 2015, at 2; TCO, Aug. 31, 2015, at 2-3 (citing N.T., 1/21/2015 p.m., at 66, 69, 71-72, 118, 120-22). Most importantly, an independent eyewitness, Shaw, identified Appellant as the shooter. N.T., 1/22/2015, at 99, 105, 247. Surveillance footage confirmed that Shaw was near the scene minutes after the shooting occurred. TCO, Aug. 31, 2015, at 4 (citing Commonwealth Exhibit 42; N.T., 1/22/2015, at 8, 10, 12, 14, 20-37). Shaw was not involved in the fight leading to the shooting, and she had been unwavering in her identification of Appellant as the shooter since her first statement to police. *Smith*, No. 2304 EDA 2015, at 1-2. Thus, even if Burley had never testified and Schmidt's police statements had never been mentioned during trial, this other evidence would have been sufficient to convict Appellant of all charges. Consequently, there was not a reasonable probability of a different outcome, *Medina*, 209 A.3d at 1000, and Appellant's final claim is without merit.

* * *

For the reasons given above, we conclude that Appellant's issues raised on appeal are meritless or waived. Having discerned no error of law, we affirm the order below. ***See id.*** at 996.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/19